119 N.J. Super. 593 (1972)
293 A.2d 203
JOSEPH CEVA, LUCIAN NIEMEYER, RICHARD A. KURLAND AND MARILYN KURLAND, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
TOWNSHIP OF RIVER VALE, BOROUGH OF CLOSTER, BOROUGH OF DEMAREST, BOROUGH OF HARRINGTON PARK, AND BOROUGH OF NORWOOD, DEFENDANTS-APPELLANTS, AND BERGEN COUNTY SEWER AUTHORITY, DEFENDANT-RESPONDENT, AND BOROUGH OF NORTHVALE, BOROUGH OF HAWORTH, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 1, 1972.
Decided June 28, 1972.
*594 Before Judges CONFORD, MATTHEWS and FRITZ.
*595 Mr. Richard A. Kurland argued the cause for plaintiffs-appellants.
Mr. William A. Fasolo argued the cause for defendant-appellant Borough of Demarest.
Mr. Edward J. Cahill argued the cause for defendant-appellant Borough of Closter.
Mr. Victor W. Hart argued the cause for defendant-appellant Township of River Vale (Messrs. Gladstone, Hart, Kronenberg, Mandis, Rathe & Shedd, attorneys).
Mr. Marvin Olick argued the cause for defendant-appellant Borough of Norwood (Messrs. Gruen, Sorkow and Sorkow, attorneys).
Mr. Joseph A. Rizzi argued the cause for defendant-appellant Borough of Harrington Park (Messrs. Winne & Banta, attorneys).
Mr. James D. Demetrakis argued the cause for defendant-respondent Bergen County Sewer Authority (Messrs. Gross, Demetrakis & Donohue, attorneys; Mr. Joel M. Ellis, on the brief).
The opinion of the court was delivered by CONFORD, P.J.A.D.
This is an appeal by the four individual plaintiffs, taxpayers of the Township of River Vale, and by five municipalities, including River Vale, originally made defendants, from a summary judgment entered by the Law Division in favor of defendant Bergen County Sewer Authority ("Authority"). By stipulation of the parties on entry of judgment the only issue remaining, and reserved for appeal, is the validity of a certain "base charge" for participation by the seven defendant municipalities in what is described as the Northern Valley extension of the sewerage *596 system maintained by the Authority under and by virtue of L. 1946, c. 123 (N.J.S.A. 40:36A-1 et seq.).[1] That participation was agreed upon by formal contract of the seven municipalities with the Authority which bears date of October 7, 1969. River Vale's enabling ordinance was adopted September 10, 1970. The bond resolution for constructing the extension was adopted by the Authority December 2, 1970.
The complaint was filed November 2, 1970. It was not decided below, and the Authority does not here argue, that the proceedings were not timely instituted nor that the appealing municipalities are without standing by reason of their entry into the agreement aforesaid or for any other reason. We therefore deal with the merits of the only question properly before us  the validity of the base charge.
An understanding of the nature and operation of the base charge requires some background.
The presently controlling 1946 statute stems from a predecessor enactment, L. 1933, c. 373, creating the Hackensack River Sewerage District, adopted for the general purpose of reducing pollution in the drainage area of that stream by collection and disposal of sewerage therein. A 1945 revision of that act (which repealed it) (L. 1945, c. 300) was held unconstitutional as special legislation not properly enacted. Sherwood v. Bergen-Hackensack, etc., Authority, 135 N.J.L. 304 (E. & A. 1947). The present act, dealing in general terms with streams in first or second class counties whose drainage areas include more than one municipality and where the degree of pollution is or threatens to be a danger to the public health in the judgment of the board of freeholders, permits the establishment of county sewer districts by such boards. Section 1. The constitutionality of this act was upheld in Little Ferry v. Bergen County Sewer Authority, 9 N.J. 536 (1952).
*597 Sections 29 and 30 of the act provide that prior to the creation of a district sewer system or any part of it the Authority shall procure a project report which, among other things, is to make estimates (1) of the percentage of sewage volume from existing municipal or private sewage systems which must flow into the district system "in order to make possible and advisable the advantageous and economical construction and operation of the proposed * * * system" and its financing, par. (d); (2) of the cost of construction and financing up to the beginning of the first fiscal year, par. (e); (3) of the amount of money required annually for the first 40 years of operation of the system, par. (f); (4) "of such rates to be charged in each year and * * * paid to the authority * * * sufficient [with funds already received] to raise the * * * money required by the authority for at least the first ten fiscal years * * *" to meet the estimates fixed in par. (f), par. (g).
Section 43 reads as follows:
After the commencement of operation of a district sewer system of an authority under this act the authority may prescribe and change from time to time rates to be charged for the discharge and disposal of sewage through its district sewer system. Said rates shall be prescribed and from time to time revised as hereinafter provided, so that an authority and its district sewer system shall be and always remain self-supporting with earnings sufficient to provide for all expenses of operation, maintenance, depreciation and repair and the payment of the principal and interest of any bonds issued or to be issued pursuant to this act, so as to prevent the accrual of any deficit. Such rates being in the nature of use or service charges, shall be uniform throughout a district for the same type, class and amount of use or service of a district sewer system and shall be based upon the total annual volume of sewerage from each municipality, private sewer company or institution; but may give weight to the characteristics of the sewage and other wastes and any other special matter affecting the cost of treatment and disposal thereof, including chlorine demand, biochemical oxygen demand, concentration of solids and chemical composition. (Emphasis added)
Section 45 reads in part:
* * * The rate referred to in section forty-three of this act shall be calculated to provide such amount as such authority reasonably *598 estimates will be required (in addition to any funds on hand applicable to such purposes) during such fiscal year for security or payments of principal and interest of any of the bonds or other obligations authorized by this act and for the cost of the operation, maintenance, depreciation and repair of its district sewer system, including establishment and maintenance of working capital and reserves, and in any event shall be sufficient to provide all such amounts as may be required by the terms of any resolution of such authority authorizing the issuance of its bonds or notes.
In section 47, after directing the certification by the Authority annually to each participating municipality, etc., of the amount due from it for the year, the act says:
* * * Such amount shall be calculated by such authority by applying the rate to the volume of sewage delivered and discharged into its district sewer system by the municipality, private sewer company or industry, during the yearly period ending on the last day of the preceding December, as shown by the records of such authority. If the terms and provisions of a contract so entered into by a municipality, private sewer company or industry require payment of any other or different amount to an authority, then such other or different amount shall be fixed and determined by such authority pursuant to the contract and shall be certified to such municipality, private sewer company or industry as hereinabove provided. If the terms and provisions of a contract so entered into by any industry require payments to an authority of a further amount in addition to the amount of money calculated as hereinabove provided, then such further and additional amount shall be fixed and determined by such authority and added to the amount calculated by it as hereinabove provided and the sum of such amounts shall be certified to such industry as hereinabove provided. In any year in which any municipality, private sewer company or industry shall not have used a district sewer system of an authority under this act for a full year prior to such last day of December, the volume of sewage to be used in calculating the amount which such municipality, private sewer company or industry shall pay to such authority shall be the volume which such authority at such time estimates will be delivered and discharged by such municipality, private sewer company, or industry during the first full year of operation of its district sewer system. In the event that any part or parts of a district sewer system shall be put into operation prior to the beginning of the first fiscal year such authority shall certify from time to time to the municipalities, private sewer companies or industries which may discharge sewage into said part or parts prior to the first fiscal year an amount or amounts which in the case of each such municipality, private sewer company and industry shall be sufficient to pay its share of the cost of operation and *599 maintenance of said part or parts during the period of operation prior to said fiscal year based upon its proportion of the total volume of sewage so discharged into said part or parts of such district sewer system. (Emphasis added)
It is apparent that the only kind of general charge for service to a municipality by the Authority expressly specified in the act is what has been generally referred to as "rate-times-flow," i.e., the gross gallonage of sewage into the system from the municipality multiplied by a uniform system-wide rate per gallonage unit (generally per million gallons)  the said rate calculated by division of the total financial requirements of the system at large for total costs of every nature, i.e., construction, financing, maintenance and operation, by the total gallonage of sewage put into the system the prior year by all participating municipalities, private sewer companies and industries.
The Authority's first service contract was signed with 11 of the original 13 participating municipalities in 1948, and the rate scheme was in accord with the foregoing. The base charge here in contention was conceived by the Authority for the first time in 1956, and was used in connection with its third participation agreement, that with Englewood Cliffs. While there was a primary provision for compensation on the basis of rate-times flow, this was made subject to a minimum "base charge." This consisted of the amount aggregated by (1) the principal and interest payable by the Authority on any bonds or other obligations issued to finance costs of construction of the Englewood Cliffs extension alone, and (2) that part of the costs estimated by the Authority for operation and maintenance, etc., of the entire system for the year deemed properly attributable to the handling of the sewage and wastes delivered into the system by Englewood Cliffs through the Englewood Cliffs extension. A credit was to be given against the base charge for sewage delivered to the system other than through the Englewood Cliffs extension. *600 If the net base charge for any fiscal year exceeded the charge resulting from rate-times-flow, the former would be applicable for that year.
Similar base charges (some varying in respect of the kinds of credits allowed) were included in some but not all the later extension contracts entered into by the Authority with various municipalities, including the Northern Valley extension agreement here in litigation. In most of the instances of such stipulations the base charge was either not activated at all or for only one or two years. The base charge for the Northern Valley extension allows no such credit as was allowed to Englewood Cliffs or to other prior participants subjected to a base charge.
We cannot find in this ponderous record the precise method by which the Authority calculates the second element of the base charge  i.e., the portion of total system costs attributable to servicing the municipality in question.
The Authority concedes in its brief that where base charges are in effect anywhere in the system the application of the statutory rate-times-flow formula in relation to participants not subject to the base charge is in practice necessarily modified. There is deducted from total costs of system financing, operation and maintenance the corresponding costs applicable to the municipalities with operative base charges and there is also deducted from total system gallonage the gallonage of those municipalities. This results, as appellants point out, in none of the participants in the system paying on the straight rate-times-flow basis prima facie required by sections 43, 45 and 47. Ex hypothesi, the municipalities not subject to a base charge in a particular year[2] pay less than what they would on straight rate-times-flow. This benefit does not necessarily accrue solely to the "original" or "older" participants in the system, as the *601 record shows that some participants admitted to the system without provision for a base charge came in after others who were subjected to such a charge.
It is further pointed out by appellants that absolute susceptibility to a base charge in any of the later years of participation by a newcomer is based, according to the evidence, upon a determination of the Authority founded upon the project report required under sections 29 and 30 (although nothing in those sections purports to authorize anything like a base charge); that estimates pursuant to said sections of costs of construction frequently are erroneous and that prognostications of anticipated sewage flow in a municipality for any substantial number of years ahead are subject to many uncertainties, including variations in rainfall, declining or increasing population or industry, etc. Yet upon such inherently variable factors the Authority makes initial determinations of future absolute susceptibility to or absolute exemption from the incidence of a base charge.[3]
We find the scheme of the act as a whole, and particularly the regulations as to rate in sections 43, 45 and 47, to speak impellingly to the objective that, essentially, rates to municipalities are to be fixed annually on the proportion of relative volume of sewage input against total cost of operation and maintenance of the system as a whole, including all capital and financing charges attributable to any part of the system and its constituents then unpaid and requiring payment in that year. The intent that earlier participants are not to be insulated from participation in costs of financing later extensions is borne out by the second sentence of section 43 which mandates that "rates" for all participants *602 shall be calculated to provide funds to meet, inter alia, the principal and interest "of any bonds issued or to be issued" pursuant to this act so as to prevent the accrual of any deficit." (Emphasis added)
Totally contrary to the plain statutory scheme of uniform treatment of all municipal participants, as viewed above, is the Authority's concept that the intent of the act is that, contingent upon its advance estimates of a new participant's discrete capital costs and potential sewage gallonage over a long term, the Authority may at the outset brand it once and for all, in effect a Class B member of the system, to be admitted subject to imposition in any year of a charge (base charge) based solely on the cost of building the new extension and the attributed cost to the system of serving it (except in years when its gallonage is such that the formula of rate-times-flow produces a sum in excess of that amount). There results from this two classes of participants in the system. One consists of true partners, paying uniformly and always an amount based on rate-times-flow (or less, as noted above); the other, of parties dealt with on a straight estimated cost of participation basis when it profits the Authority to do so but on a rate-times-flow basis when that is more favorable to the Authority.
The Authority argues that the implication of the act that any project must be "advantageous and economical" (Section 30) and the direction that rates shall always be fixed so that the system will be self-supporting with earnings sufficient to provide for all expenses of operation, maintenance, depreciation, repair and payment of bonds and interest (Section 43) somehow support the concept of a dual rate classification for municipal participants. It contends that it is thereby indicated that earlier participants must be protected from rate increases which would accrue from admission of later ones. We find nothing in the cited sections or the import of the act as a whole to support that idea. Rather is the emphasis in the cited sections on the consideration that the uniform rate shall be sufficient to provide adequate revenue for all *603 system costs and expenses of whatever nature. However, the rate-times-flow formula by statutory definition does accomplish that objective. The reference in section 30 to an estimate of the quantity or percentage of flow of sewage needed for an "advantageous and economical construction and operation" does not imply more than that the applying participant's prospective sewage flow may be considered by the Authority in deciding whether to contract with the municipality at all  not that when it admits it the Authority may fix a special onerous rate for it to protect prior members from rate increases.
While the language of the act is so clear as not to require illumination of its intent by analogous case authority, some support for the foregoing views is afforded by our decision in Landy v. Bellmawr Sewerage Auth., 61 N.J. Super. 396 (App. Div. 1960), affirming Kline v. Bellmawr Sewerage Authority, 55 N.J. Super. 153 (Ch. Div. 1959). That case involved N.J.S.A. 40:14A-1 et seq., authorizing formation and operation of county or municipal sewage disposal systems and compensating reservoirs. The section thereof that regulates rates or charges (section 8(b)) significantly resembles the third sentence of section 43 of N.J.S.A. 40:36A although it contains language giving the 14A authority considerably more latitude and discretion in the means allowed to effect uniform rates than does the statute before us. Yet the courts in that case forbade a municipal sewerage authority from charging domestic customers in a newly sewered area of a town at rates substantially higher than what was being charged in a previously sewered area, although the authority sought to justify the difference on the ground, also argued here, that the old area had already paid substantially for capital outlays to the benefit of the new area. It was held that the command of the statute that the rates "shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service" forbade the rate differential sought to be established.
*604 The Authority attempts to support its contention that the rate-times-flow provisions of the act are not intended to be the exclusive basis for rate charging, citing the third sentence of section 47 (the second sentence of the excerpt therefrom quoted above). This was also a factor strongly relied upon by the trial court in sustaining the base charge. While it is a fair assumption from the statutory provision that a contract calling for payment of another or different amount, but consistent with basic use of the rate-times-flow formula, may be entered into between a municipality and the Authority, cardinal principles of statutory construction would prevent implying an intent to permit a contractual stipulation that would under any circumstances totally displace the fundamental rate-times-flow charge enjoined by sections 43, 45 and 47, read together. See Alexander v. N.J. Power & Light Co., 21 N.J. 373, 378-379 (1956). An effort must be made to accommodate the "other or different amount" language in section 47 to the basic rate-times-flow mandate rather than to countermand it, all being in pari materia. This is most satisfactorily done by ascribing to the former an intended reference to the weighting charge which may be imposed on the flow-element in accordance with any special characteristics of the sewage affecting the costs of treatment, as specifically allowed by section 43, or to any other special factor uniquely affecting costs of the Authority in servicing the particular municipality. It is to be noted that these special weighting factors are denominated "surcharges" in the Northern Valley extension contract.
It may be of some significance that section 47 does allow contracts to pay the Authority "a further amount in addition to" rate-times-flow but only in the case of industry contracts. The base charge is in a sense "a further amount in addition to" rate-times-flow, but, as noted, the section does not purport to permit the latter in a municipal contract. We further note that the prototype 1933 statute (c. 373), in section 219, after providing for the basic rate-times-flow *605 formula in section 217, set forth a series of provisos which, in addition to the "other or different amount" and the "further amount in addition to" (for industries) clauses also found in current section 47, included one which permitted contracts with municipalities "at any higher rate"  a formula missing from section 47 of 40:36A. That expression is probably explainable by reference to section 304 of the 1933 act which contained a mandatory provision for higher rates for those municipalities which could have entered the system in a year earlier than they did. The current statute of course contains no such provision.
The existence of the foregoing provisions in the 1933 act manifests that the Legislature well knew how to articulate unambiguously the concept that an authority and a municipality were free to contract for rates higher than rate-times-flow or for amounts additional thereto where such was indeed its intent.
In any event, whatever the current "other or different amount" language in section 47 may be thought to contemplate, it is inconceivable to us that it has the intent of permitting total displacement of the rate-times-flow factor as the basic statutory element in fixing the charge, in favor of an ad hoc cost-of-construction and service-to-the-municipality base charge, as here, on the absolute and permanently effective a priori judgment and dictate of the Authority.
We feel further sustained in these conclusions by the consideration that the overriding purpose and plan of the statute is to reduce and eliminate pollution of our waterways. See section 1. This is not simply the commercial marketing of a service. A contemplated advantage to all municipalities in any such system, as well as the primary purpose of the legislation, as already noted, is the public health benefits of the reduction in area-wide pollution. The statute implicitly bespeaks the message that any undue burden to later unsewered participants which would tend to discourage their entry into the system should be avoided if reasonably *606 possible. By the same token, the benefits to earlier participants of joinder in the system by municipalities coming in later are not limited to the cost economy promoted by the addition of another member's sewage flow, but also, and perhaps of greater ultimate import, in reducing or eliminating the pollution of the common waterway by the previously unsewered newcomer. (Some or all of the Northern Valley municipalities, all now unsewered, are upriver to many of the older participants in the system.)
We find no support for the Authority's position in two decisions it relies on. In Airwick Industries, Inc. v. Carlstadt, Sewerage Auth., 57 N.J. 107 (1970) (written by a justice who participated as a judge in the Appellate Division decision in Landy v. Bellmawr Sewerage Auth., supra), involving a municipal sewerage authority's power to fix connection fees for individual consumers under N.J.S.A. 40:14A-1 et seq., the court held valid a schedule of connection fees escalating with passage of time. It was noted that by a 1968 supplement to the act a charge distinct from the periodic service charge, in the nature of a connection or tapping fee, was expressly authorized. While it was required to be uniform within each class of users it was otherwise to be within the discretion of the authority. The court held that since the system had always been available to the later connector, and enhanced the value of his property, the escalation in the fee could be justified as requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for bond costs. There is no fair analogy therein to the present case, on either the facts or the respective statutes. The particular statutory mandate in the instant statute respecting charges is controlling.
In Middlesex County Sewer. Auth. v. Borough of Middlesex, 74 N.J. Super. 591 (Law Div. 1962), aff'd o.b. 79 N.J. Super. 24 (App. Div. 1963), again dealing with N.J.S.A. 40:14A-1 et seq., the attack was upon a schedule of charges by a county sewerage authority calling for a declining *607 rate with increasing amounts of sewerage delivered to the contracting municipality. While section 8(b) of N.J.S.A. 40:14A contains the uniformity provisions alluded to above in connection with the discussion of that act in relation to Landy v. Bellmawr Sewerage Auth., supra, there is also a section 23 which permits the contract to be on any terms and conditions approved and agreed to by the parties. It was held that since the complaining municipality agreed to the sliding rate schedule it was bound by it. This decision is obviously of no pertinence here where we are, in effect, construing the instant statute as precluding freedom to contract for a substituted charge totally different from the rate-times-flow charge we deem mandated by this act.
In view of the foregoing conclusions it is not material whether plaintiffs' allegations of fraud by the Authority have merit. In any event, contested issues of fact are presented which would require a plenary hearing to decide.
However, we grant the motion of the Authority to strike the allegations as to fraud and other matter unrelated to the issue of the legality of the base charge contained in the briefs filed by plaintiffs and the Borough of Closter as we regard the plain, deliberate and unequivocal stipulation of the parties in the judgment, mentioned above, as controlling to eliminate such issues from the case.
A motion by the Borough of Closter to require the Authority to take certain steps at once in connection with the effectuation of the Northern Valley extension is denied without prejudice, the subject matter thereof being deemed more appropriately within the purview of the trial court rather than this one.
Judgment reversed, without costs.
NOTES
[1] Generalized references hereinafter to "the act" or to "sections" of the act will be to sections of N.J.S.A. 40:36A.
[2] Whether not provided for at all in the original contract, or, if provided for, not activated in that year by virtue of the base charge terms.
[3] Note that a municipality contracting without provision for a base charge is forever exempt therefrom even though, were such a provision in its contract, it might become subject to its incidence in one or more later years because of such factors as diminished gallonage (perhaps because of weather) or increased cost of handling its sewage or for other pertinent reasons.