174 N.J. Super. 519 (1980)
417 A.2d 56
IRVIN TABAAC, INDIVIDUALLY AND ON BEHALF OF ALL TAX-PAYERS IN THE CITY OF ATLANTIC CITY, COUNTY OF ATLANTIC, STATE OF NEW JERSEY, AND BOARDWALK PROPERTIES, INC., INTERVENOR, PLAINTIFFS,
v.
THE CITY OF ATLANTIC CITY; HOUSING AUTHORITY AND URBAN REDEVELOPMENT AGENCY OF ATLANTIC CITY; ATLANTIC CITY ASSOCIATES, INC.; CONVENTION CENTER HOTEL ASSOCIATES; PLAYBOY OF ATLANTIC CITY; PLAYBOY OF NEW JERSEY, INC.; DOROTHY M. WHITNER; WILLIAM C. WHITNER; MILTON N. ZIC; JOHN W. MCTIGUE; WILLIAM E. CRAVER, JR.; PLAYBOY-ELSINORE ASSOCIATES, AND ELSUB CORPORATION, DEFENDANTS.
Superior Court of New Jersey, Law Division Atlantic County.
Decided May 6, 1980.
*521 Matthew H. Powals, for defendant City of Atlantic City.
Bertram M. Saxe, for defendant Housing Authority and Redevelopment Agency of Atlantic City.
Patrick C. English and Ralph W. Platine, for plaintiff Tabaac (Krantz, Feldman & Platine, attorneys).
William F. Campbell, III, for plaintiff Boardwalk Properties, Inc. (Dillon, Bitar & Luther, attorneys).
Arnold K. Mytelka and Edward N. Fitzpatrick, for all defendants except City of Atlantic City and Housing Authority and Urban Redevelopment Agency of Atlantic City (Clapp & Eisenberg, attorneys).
HAINES, J.S.C.
In 1967 Atlantic City (city), concerned about its declining ratables and deteriorating convention business, adopted an urban renewal plan for an area adjoining its boardwalk and Convention Hall. Responsibility for execution of the plan resided in its Housing Authority and Redevelopment Agency (Housing *522 Authority or Authority). In April 1973 the Authority succeeded in negotiating a redevelopment contract with Atlantic City Associates, Inc., which was unable to perform the agreement by reason of financial difficulties. Nevertheless, it was considered by the parties as remaining in force; on March 4, 1977 the Authority authorized its assignment to Convention Center Hotel Associates and, on March 23, 1979, its further transfer to Playboy-Elsinore Associates (Playboy-Elsinore or Playboy). Playboy accepted a deed conveying title to the property covered by the agreement on April 24, 1979.
Playboy-Elsinore required substantial parking facilities for use in connection with the hotel-casino it intended to construct on the redevelopment tract. Space was available under a recently constructed annex to Convention Hall controlled by the city. In 1977 the city leased this space to the Authority, which subleased it to Playboy-Elsinore in 1979. The term of the lease was 50 years, the rent $35,000 a year, subject to adjustment reflecting changes in the Consumer Price Index.
On September 10, 1979 Irvin Tabaac filed suit, as a taxpayer on behalf of all the city's taxpayers, against the city, the Authority, the three transferees of the redevelopment agreement and various other participants in these transactions. Boardwalk Properties, Inc., another taxpayer, was later permitted to intervene. Many complex issues were raised; extensive discovery was undertaken and voluminous records examined. The suit posed special problems for Playboy-Elsinore, which had commenced construction of its hotel-casino project prior to the commencement of the suit, construction which continued during its pendency. On March 24, 1980, with discovery nearly complete, Playboy argued a motion for summary judgment, demanding dismissal of the action. At that time its investment in the property approached $30,000,000 and increased thereafter at the rate of $500,000 to $1,000,000 a week. The motion raised substantial questions; briefs, affidavits and exhibits filed in connection with it were voluminous. Factual differences and difficulties required its denial; consequently, no determination was made as to the substantive claims of the parties. Trial, *523 however, was accelerated and scheduled for April 21, 1980. The parties then reached a settlement, the terms of which were announced in open court on April 18, 1980. These terms, stated briefly, required the dismissal of all of plaintiffs' claims in consideration of Playboy's agreement to guarantee an annual rental for the parking facility of $110,000, as opposed to the rent payable under the existing lease of $35,000, plus or minus adjustments based on the Consumer Price Index. In addition, Playboy agreed to pay $10,000 a year to the Authority during the last 20 years of the lease and to pay counsel fees of $40,000 and expenses of $7,000 to plaintiff Tabaac's attorneys. A real estate appraiser, employed by plaintiffs, was allowed to apply to the court for approval of his fees of $9,600; if approved, they are to be paid from the increased portion of the rents to be received by the Authority. All rentals received above the amount fixed in the original lease to Playboy are to be used for low-income housing in the city.
It was understood that the settlement would become effective when it received my approval, to be given only if I reached the conclusion that its terms were fair to all of the City's taxpayers. An opportunity for their participation therefore became necessary, and a hearing at which they could voice objection was set for April 18, 1980. Notice of the hearing, reflecting the terms of the proposed settlement, was advertised in two Atlantic City newspapers, once in each of the two weeks preceding the hearing date. Two attorneys, representing taxpayer groups, appeared at the hearing. There were no other appearances. One group requested a modification of the settlement terms so that part of the monies otherwise allocated to low-income housing would be set aside for "moderate" income housing, depicted as a pressing need in the city. The other group appeared for the purpose of stressing the need for low-cost housing and requested additional terms of settlement establishing controls over the monies to be received which would increase the assurance that such housing would be constructed. Neither group presented any other objection to the terms of settlement. The parties, in response to these suggestions, advised the court that they were unwilling to make any changes in the conditions of settlement.
*524 There is no reason to believe that provision for moderate-income housing is any more beneficial to the taxpayers of the city than an allocation of all settlement monies to low-income housing. Additional controls over the use of these monies by the Authority are not advisable; administrative flexibility residing in the Authority should not be hampered. It is the court's function to determine the reasonableness of the agreement, not to renegotiate the terms of settlement. Consequently, I will not require changes in the settlement agreement as a result of the suggestions made by the taxpayer groups.
In addition to the taxpayer's hearing, I have taken the testimony of experts, who provided opinions as to the value of the leasehold interest acquired by Playboy-Elsinore and the value of the rights and warrants acquired by the initial transferors of the redevelopment agreement. Further, at my request, the parties submitted affidavits, briefs, appraisals and documents providing information on the issues of attorney fees, appraisal fees, parking facility charges, title problems and real estate values. These supplemented the very extensive records and briefs previously filed.
A discussion of the issues involved in this matter is necessary in order to appreciate the problems faced by all parties and the advisability of resolving them through the settlement mechanism. They are as follows:

1. Violations of the Open Public Meetings Act
Plaintiffs have contended that the meetings of the Authority were conducted in private, were not properly advertised or otherwise noticed and were not properly recorded. The Authority has disagreed, claiming that it took no action at any private meeting and that the meetings in question were properly noticed and recorded. It also asserts its ratification of all actions and insists, in any event, that suit was started much too late. It points to the section of the Open Public Meetings Act, N.J.S.A. 10:4-15, which bars any suit claiming violation of its provisions more than 45 days after its actions have been made public. My reading of the minutes of the Authority's meetings indicates *525 considerable informality and raises questions about notice. There were many private meetings during which the Playboy-Elsinore transaction was discussed. However, the records do not indicate that action was taken at these meetings; they were for discussion purposes only. Further, the significant actions taken by the Authority were made public and were well-advertised more than 45 days before this suit was commenced. On the other hand, testimony might have shown that more than discussion took place at the private meetings; that there were violations of the act and that public disclosure of actions taken was inadequate. Many factual questions were involved and the outcome of this issue was not certain.

2. Timeliness of Suit  R.4:69-6
R. 4:69-6 prohibits the commencement of an action in lieu of prerogative writ, as here, later than 45 days after the accrual of the right to relief, with certain exceptions. Defendants argue that the cause of action accrued much more than 45 days prior to the date of the complaint was filed. The argument has obvious substance; the transactions complained of were consummated on April 24, 1979; suit was filed on September 10, 1979. Plaintiffs would deny the application of the rule on the ground that the limitation period did not run until after they learned more facts than were revealed in the public announcements of the Authority. This knowledge was not obtained until its records were examined, records not readily available until after suit commenced. They also point out that the rule permits its relaxation "in the interest of justice," and claim this exception applies because important constitutional questions and significant public rights are involved, issues which require relaxation under our cases. Schack v. Trimble, 28 N.J. 40, 48 (1958). Again, nice questions were raised which could not be resolved without a full hearing.

3. Assignment of the Lease
The lease, eventually acquired by Playboy-Elsinore, was never exposed to competitive bidding. Plaintiffs argue that this was *526 improper, resulting in an extremely low rent, constituting a municipal gift to an individual, association or corporation, in contravention of the Constitution. N.J.Const., (1947), Art. VIII, § III, pars. 2 and 3. Defendants, however, point to N.J.S.A. 40A:12-14(a), which authorizes the lease from the city to the Authority without bidding, and to N.J.S.A. 55:14A-41, which eliminates the bidding requirement in connection with a redevelopment plan. They insist that the transfer of the lease was for a public purpose, i.e., redevelopment and removal of blight, and that the rent represented "fair use value," thus meeting the requirements of the statute. These arguments could not be resolved without a hearing. Central to the issue, however, was the question of whether the rent for the parking facility was reasonable. That question involved considerable speculation. The value of the facility depended upon the success of the hotel-casino venture, not yet licensed, far from being ready for business and far from any determination of profitability. The rent established by the lease to Playboy-Elsinore is subject to the Consumer Price Index and will increase substantially in June 1980. On the other hand, the very substantial need for parking space in Atlantic City has become obvious and the revenue potential of a parking garage is high. The lack of any public bidding and the apparent lack of any appraisal raise questions as to whether the rent was adequate.
Testimony was presented showing gross income from the rental of parking space in two garages under Convention Hall, one being the facility subleased to Playboy. In 1977 the gross revenue from both garages was $101,000 and in 1978 $105,000. Figures reflecting the separate income of each facility were not available until 1979, when Convention Hall received rents from the Playboy garage for six months in the gross amount of $20,600; it rented its second garage for the entire year 1979, receiving a gross income of $107,000. No appropriate expense figures were available, but it is apparent that these gross rentals would be reduced substantially by the cost of labor, maintenance and overhead. It was the opinion of a real estate appraisal expert that the agreed original rental of $35,000 a year was *527 reasonable. It was his further opinion that the $110,000 rental now proposed by Playboy was very generous.
An additional factor favoring the lower rent first agreed upon was the existence of a title defect, consisting of a claim by the State of New Jersey to an interest in a part of the leased premises. This is discussed below in connection with the assignment of the redevelopment agreement; the claim prejudiced the use of the property and adversely affected the value of the lease until the State's interest was acquired at substantial cost.

4. Assignment of the Redevelopment Agreement
The redevelopment agreement, eventually assigned to Playboy-Elsinore and consummated by it, was entered into by the Authority in 1973, before casinos were permitted in Atlantic City. The price fixed for the property then was $510,000; it was not changed when the property was acquired by Playboy-Elsinore. Plaintiffs argue that the land value had increased several times when the assignment to Playboy-Elsinore was made; that the failure to negotiate a new agreement fixing a much higher sales price requires the conveyance to be set aside. Furthermore, they point to the possible violation of a number of United States and New Jersey regulations imposed in connection with government loans made for development of the property, on the basis of which they claim that the assignment of the agreement was unlawful. Finally, they charge that Convention Center Hotel Associates, the first assignee of the redevelopment agreement, controlled by Playboy, paid a profit to the assignor, Atlantic City Associates, a profit which belongs to the Authority under government regulations. Defendants raise a number of substantial arguments in response to these claims. They insist that the redevelopment agreement was in force and properly assigned and that no government regulations were violated. They claim that the price of $510,000 represented "fair use value," the appropriate measure of value for a redevelopment sale.
Playboy also points to serious title defects which existed with respect to the property, substantially decreasing its value. The *528 existence and significance of these defects are clear. The State of New Jersey claimed certain interests in all of Playboy's properties, including its leasehold. After much negotiation Playboy succeeded in acquiring the interest of the State in certain air space for a cash payment of $362,750. In addition, it made a cash payment to the State of $694,692 for the State's interest in the land purchased from the city, the leasehold interest acquired from the city and a third property otherwise acquired by Playboy. Further, it was obliged to execute an agreement to pay the sum of $3,936,586 to the State ($694,692, in addition to the above cash payments, being placed in escrow to secure the agreement), if before April 15, 1982 the State, through litigation, is able to show that its interest is genuine. Thus, the true value of this property was very much in question. It was the opinion of the real estate expert, who was presented at my request, that the value of the redevelopment tract purchased by Playboy from the Authority was $192,000 in April 1973, $790,000 in March 1977, $1,344,000 in September 1978 and $1,580,000 in April 1979, the first date reflecting the year the redevelopment agreement was executed and the last date the time that title was conveyed to Playboy.
Nevertheless, Playboy-Elsinore's predecessor, Convention Center Hotel Associates, was paid more than $510,000 for the property. The actual price was $1,255,437.35, representing expenses of the assignor, as reflected in the report of a certified public accountant. Reimbursement of expenses would not represent a profit to Atlantic City Associates. However, the individual principals of that entity received warrants for 120,000 shares of Playboy stock and rights to acquire 10% of any future casino project undertaken by Playboy in Atlantic County before December 31, 1981. To the extent that these warrants and rights had value, they would appear to represent a profit to the principals of Atlantic City Associates, possibly recoverable by the Authority through plaintiffs.
William C. Whitner, one of the principals of Atlantic City Associates who received warrants and rights, testified concerning their disposition. He said that the rights no longer existed, *529 having been surrendered in exchange for permission to exercise the warrants at an earlier date than first agreed. These warrants, however, have never reflected an attractive price for the Playboy stock and none has been exercised. They are nonnegotiable and nontransferrable. Any stock acquired through the exercise of the warrants cannot be used as collateral because it will be "lettered" stock, restricted against sale for two years after its acquisition.
Frank DiPrima, vice-president of Playboy and its general counsel, pointed out the many factors which made the value of the rights and warrants highly speculative when they were first acquired. There was considerable risk that Playboy would not be able to raise the money to build a casino and would not be successful in obtaining a casino license. Furthermore, at that time the financial condition of Playboy was poor; in 1977 its principal stockholder was obliged to waive the payment of dividends because the corporation's income was too meager to pay them. The time limits then placed on the exercise of the warrants, the fact that they would permit the acquisition of "lettered" stock only and that any profit realized when the warrants are exercised would be taxable, all made the value of the warrants very low.

5. Conflicts of Interests
Plaintiffs alleged that the Director of the Authority, during the period of Playboy's negotiations, was under consideration for a position as head of a lobbying group of which Playboy was a part, and therefore involved in a conflict of interests. They further claim that the Assistant Director of the Authority, during the same period of time, owned 300 shares of Playboy stock and earned a $5,000 commission from the sale of an office building to Playboy  additional conflicts of interests. No conflict claims were made against any member of the Authority. Plaintiffs acknowledge that they cannot show any knowledge by any official, principal or employee of Playboy of these conflicts, and have no proof that conflicts influenced any action taken by any of the parties. It also appears that the claimed conflicts *530 were very tenuous. The Director of the Authority never discussed his proposed lobbying position with Playboy or its representatives, although it was a member of the lobbying group; he disclosed the circumstances to the members of the Authority as soon as they were known to him, as required by N.J.S.A. 40:55C-7, and appears to have acted with discretion and responsibility. The Assistant Director held his Playboy stock for only about a month and sold it at a loss. The real estate commission which he received was paid by a broker to whom he reported Playboy's interest in acquiring an office building; he had a broker's license and was entitled to share the commission. The only communication he had with a representative of Playboy was limited to advice as to the price of the building; Playboy was not aware that any commission had been paid. For these reasons plaintiffs withdrew their claim of participation by Playboy and the Authority in knowing conflicts of interest, an action which requires my scrutiny in determining the fairness of the settlement agreement.
It is not every conflict of interest which invalidates official action. No case has been found squarely covering the effect of a conflict of interest when the official involved has no power to act on the matter at hand. McQuillin, Municipal Corporations (3 ed. 1966), § 29.98 at 477-78, states that the general rule invalidating official action by reason of such a conflict does not apply where (1) "the interested officer or employee is without power or authority to act on behalf of the municipal corporation" and (2) "where official acts and disabling interests do not coincide in time." Both of these saving circumstances are present here. Neither the Director nor the Assistant Director had power to act; the action complained of took place in 1979, after both the Director and Assistant Director had left their positions, one in 1977 and the other in 1978.
Remote conflicts of interest have no adverse effects. In Wilson v. Long Branch, 27 N.J. 360 (1958), the chairman of a planning board and one of its members were directors and stockholders of a bank holding mortgages in an area which was the subject of a blight recommendation by the board. The court *531 held that these interests were too remote to prevent the members of the board from acting. In Van Itallie v. Franklin Lakes, 28 N.J. 258 (1958), the court said:
Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, "Universal distrust creates universal incompetency." [at 269]
The legislative attitude may be reflected in N.J.S.A. 40:55C-7, a part of our Redevelopment Agencies Law. That section prohibits any commissioner or employee of an agency from acquiring a direct or indirect interest in any project, property or contract involved in a redevelopment area. In the event such interest is acquired, immediate written disclosure to the agency is necessary. Failure to disclose constitutes misconduct in office and is cause for removal. There is no requirement for setting aside any action in which such an official has engaged.
On the facts of the present case it is doubtful that evidence could be produced of any conflict of interests so great that the lease and conveyance to Playboy would be invalidated, and doubtful also, as a matter of law, that a conflict of interests involving an official without power to act who left the Authority well in advance of the action taken would have any effect on the validity of that action. Under the circumstances, the decision of plaintiffs to withdraw their conflict of interests claims was not unreasonable and not improper.

6. Fraud
Plaintiffs claimed that Playboy-Elsinore and its principals made representations to the Authority that no profit had been received by Atlantic City Associates in connection with the transfer of its redevelopment agreement to Playboy's affiliate, Convention Center Hotel Associates. In fact, the discovery *532 efforts of plaintiffs failed to support the allegation. Consequently, plaintiffs withdrew this claim at the pretrial conference. This action had obvious propriety. It was required to discharge the obligation of candor with respect to a serious issue which plaintiffs could not prove.

7. Damages v. Equitable Relief
The principal relief sought by plaintiffs was the setting aside of the sale and lease transactions. Damages constituted a secondary demand. In the final analysis, however, the only recovery would be damages, since an avoidance of the transactions would return the properties to the Authority, which would negotiate a new sale and sublease. Playboy, pointing to its good-faith reliance on the official actions of the city and the Authority, and asserting innocence with respect to plaintiff's claims, argues that damages represent the only proper relief available to plaintiffs. It insists upon the denial of relief which would upset the transaction. Playboy also underlines certain practical considerations which make that relief inadvisable: (1) its investment of over $30,000,000 in the property, an inequitable windfall if it were held to belong to the Authority and an undesirable encumbrance if it were not, and (2) the circumstance that its hotel-casino complex occupies two properties, connected by a bridge over a street, only one of which involved the city and the Authority, so that setting aside the sale and lease transactions would leave the Authority in control of half of an existing structure. The Playboy arguments have weight and may well have met with ultimate success.

8. Laches and Estoppel
Laches and estoppel were additional defenses raised against plaintiffs' claims which were not given any thorough consideration, merely being touched upon in connection with the motion for summary judgment. The enormous investment made by Playboy after it acquired title and before the commencement of the suit argues persuasively in favor of these defenses. They represent additional obstacles facing plaintiffs; standing alone, they might have caused the denial of any relief to plaintiffs.
*533 The existence of these difficult issues, the substantial arguments available to both sides and the inability to forecast with any confidence the final outcome of these proceedings, make a fair settlement of the issues an acceptable resolution of the litigation insofar as the taxpayers of Atlantic City are concerned. It therefore becomes necessary to consider the rules for settlement and, if they are met, whether the terms are fair and reasonable.
Taxpayers' suits are viewed with liberality by our courts and regarded as highly appropriate for the redress of public wrongs. Haines v. Burlington Cty. Bridge Comm'n, 1 N.J. Super. 163, 172 (App.Div. 1949). The within action is either a class action or, since plaintiffs' recovery will directly benefit only the Authority, a derivative action on its behalf by taxpayers indirectly affected. In Riddlestorffer v. Rahway, 82 N.J. Super. 423, 432 (Law Div. 1964), a taxpayer suing to set aside a municipal contract was described as "one claiming a derivative right"; the court noted that "the taxpayers of a municipal corporation when suing for the benefit of the corporation can recover only on the basis for which said municipal corporation could recover." However, in Paterson v. Paterson General Hosp., 104 N.J. Super. 472, 475 (App.Div. 1969), taxpayers seeking to prevent the removal of the defendant Hospital from the city were not said to be exercising a derivative right. The court said flatly, "This action is a class action ..." In re Petition of Gardiner, 67 N.J. Super. 435, 448 (App.Div. 1961), concerned a suit by a taxpayer seeking to set aside an appropriation made by Jersey City. The action was referred to as a "class suit." Valle v. North Jersey Automobile Club, 125 N.J. Super. 302 (Ch.Div. 1973), dealt with an action by the members of the defendant club attacking certain transactions of its officers and directors. The court distinguished between derivative actions and class actions:
In considering the merits of defendants' contention it must be recognized that there is a real substantive difference between a derivative cause of action by shareholders to enforce derivative or secondary rights ... and a claim asserted in a class action to enforce primary rights ... In the former the alleged wrong was committed against the corporate entity. Any recovery by the representative plaintiff inures to the corporation's benefit, not the plaintiffs'. In the class action the representative plaintiff has been directly harmed and sues to redress his grievance and those of all shareholders similarly situated. [at 307]
*534 Our rules deal with class actions and shareholders' derivative actions; they do not mention taxpayers' suits in setting forth procedural requirements relating to either. R. 4:32. No decision has been brought to my attention applying its provisions to such suits and the absence of any reference to them in the rules must be considered intentional. If it is not intentional, parties to taxpayers' suits may be prejudiced by an innocent failure to adhere to its provisions. For example, R. 4:32-2 requires the court entertaining such a suit to determine whether it may be maintained as a class action; this requirement has not been applied in reported opinions concerning taxpayers' suits, and has not been applied in the present litigation. I see no need to require adherence to R. 4:32 here. It is nevertheless clear that the proposed settlement directly or indirectly affects thousands of taxpayers in Atlantic City, while only two taxpayers have negotiated its terms. It would be entirely irresponsible if the resolution of such litigation could be effected by so small a minority without requiring court approval. The requirements of the rule with respect to settlements provide guiding principles. It provides that "a class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." R. 4:32-4. In the present case, notice of the proposed settlement and an opportunity to be heard has been given to all of the taxpayers of the city pursuant to my direction. No significant objection was made to the proposed agreement at the hearing.
Settlement of litigation of all kinds is to be encouraged; public policy supports its amicable disposition. Jannarone v. W.T. Co., 65 N.J. Super. 472, 476 (App.Div. 1961), certif. den. 35 N.J. 61 (1961); Judson v. Peoples Bank & Trust Co., 25 N.J., 17, 35 (1957). When taxpayers' suits are concluded by a court-approved settlement or by trial, the disposition should be final and binding upon all taxpayers similarly situated. Any other result would be intolerable, subjecting defendants, frequently public bodies, to the prospect of a multitude of suits, making settlements impossible and final judgments inconclusive. Certainty is *535 as much a necessity and as much in the public interest in taxpayers' actions as in any other. "The general rule is that in the absence of fraud or collusion a judgment for or against a governmental body in such an action is binding and conclusive on all residents, citizens and taxpayers with respect to matters adjudicated which are of general and public interest." In re Petition of Gardiner, supra, at 448. In Paterson v. Paterson General Hospital, supra, the intervening taxpayers objected to the settlement of the suit. The court said (at 475): "The intervenors have no greater or lesser right than any other members of the class. They cannot prevent approval by the court of a reasonable compromise of an action instituted for the benefit of the entire class of which they are only two individual members." Smith v. Allegheny Corp., 394 F.2d 381, 391 (2 Cir.1968), the court refused to set aside a fair compromise of litigation at the instance of persons having a derivative right of action who were not parties to the original suit or the settlement thereof; representation of them by the other members of their class who consummated the settlement was held to be binding on all members of the class. See, also, Restatement, Judgments, § 86, Comment (c) (1942).
In Manual for Complex Litigation, Part 1, § 1.46 (West 1977), a publication for use with Wright and Miller Federal Practice and Procedure, (1969), considerations to be used in the settlement of class actions are discussed and are applicable here.
The following are relevant:
1. The strength of the plaintiff's case balanced against the amount of the settlement offer.
2. The ability of the defendants to pay.
3. The complexity, length and expense of further litigation.
4. The amount of opposition to the settlement. [at 56, citing cases]
These criteria, applied to the facts presented, invite approval of the settlement. Plaintiffs' case exhibits strength respecting the issues involving the Open Public Meetings Act, the insufficiency of the rent for the parking facility and the profit made by Atlantic City Associates on the first assignment of the redevelopment agreement. Compliance with the provisions of the Open Public Meetings Act, however, was the responsibility of the *536 Authority, not Playboy, a circumstance which would not permit a court to overlook a proved violation, but one which deserves consideration in weighing the fairness of the settlement. Concerns about the lease transaction, in the final analysis, involve only the adequacy of the rental payment. An absolutely correct figure is not attainable. It seems likely that the rent of $35,000 a year, notwithstanding its probable increase through application of the Consumer Price Index, was somewhat low. The settlement guarantees a rent of $110,000 a year, for 50 years, plus $10,000 a year during the last 20 years of the lease. This increase in rent is substantial and I cannot say that it is inadequate. The amount of profit involved in the assignment of the redevelopment contract by Atlantic City Associates depends upon the value of the rights and options given to its principals. That value is very difficult to fix and I am convinced that it was not high. The claim to that profit is foreclosed by the settlement, being included as a part of the increased rent payments to be made under the lease. The total amount guaranteed to the Authority as a result of the settlement exceeds the amount payable under the original lease (disregarding the effect of the Consumer Price Index, which may both rise and fall) by $3,950,000. A very substantial sum is therefore to be made available to the Authority for the construction of low-income housing in Atlantic City, an important municipal need. The amount cannot be called unreasonable by any available measure. All of the issues favoring plaintiffs are subject to numerous defenses, several of which have considerable appeal. Defendants were entitled to substantially discount the potential recovery of plaintiffs because of these defenses, which could have denied any relief whatsoever to plaintiffs.
Defendants' ability to pay is not a factor in the settlement; that ability is substantial. The complexity, length and expense of further litigation, however, are significant factors to consider in determining the advisability of approving the agreement. This is a very complex lawsuit. Its trial was expected to consume two weeks and a number of issues would have warranted appellate proceedings, a strong likelihood in view of the *537 public nature of the cause, the substantial property rights involved and the novelty of some issues. The record would be voluminous and further litigation considerable. Settlement came only after completion of exhaustive discovery proceedings and on the eve of trial, when all counsel were fully prepared. Consequently, the parties were able to weigh the risks involved and to negotiate a balanced agreement. I conclude that the settlement represents a fair and reasonable compromise, advantageous to and binding upon all taxpayers of Atlantic City.
The settlement agreement requires the payment of $40,000 in counsel fees to Tabaac's attorneys. His counsel performed the bulk of the work in connection with this litigation since Boardwalk Properties, Inc. was permitted to intervene only after preparation for trial was nearly complete. It therefore seeks no counsel fees. The figure is entirely reasonable in view of the responsibilities and complexities of the case, the risks involved and the questionable capacity of the individual plaintiff to bear the costs of litigation. Proofs submitted show that 811 hours were expended by counsel in pursuit of this action. Consequently, the amount of the fee represents less than $50 an hour and includes overhead as well as profit. This rate is below the average for lawyers in New Jersey and elsewhere. The question, therefore, is not the reasonableness of these fees, but whether they may be allowed under our rules, especially where, as here, they are part of a consent agreement. R. 4:42-9 limits the allowance of counsel fees to certain specified circumstances, the only one applicable here being R. 4:42-9(a)(2), permitting a court in its discretion to allow fees out of "a fund in court." Counsel fees have been allowed in a derivative action, Valle v. North Jersey Automobile Club, 141 N.J. Super. 568, 572 (App.Div. 1976), mod. on other grds. 74 N.J. 109 (1977). A certified copy of an order of the Supreme Court made May 29, 1973 in the case of Ceva v. Bergen Cty. Sewerage Auth., 119 N.J. Super. 593 (App.Div. 1972), aff'd 62 N.J. 245 (1973), reflects an allowance of a fee of $50,000 to counsel representing taxpayer plaintiffs in that litigation. It is presented as authority for the allowance here but may not be accepted. The question of *538 counsel fees was not discussed in the court's opinion and the order itself was not published. However, other opinions set forth general rules on the subject and support the right to the allowance. In Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162 (1960), the Supreme Court said:
In general, allowances are payable from a "fund" when it would be unfair to saddle the full cost upon a litigant for the reason that the litigant is doing more than merely advancing his own interests. Thus, for example, when there are classes of claimants to the fund and the services redound to the benefit of others as well, it is fair that all contribute to the cost by a charge against the subject matter ...
Where the litigant creates a fund which will benefit others, again it is just that the fund be charged ... [at 168]
In Sarner v. Sarner, 38 N.J. 463 (1962), the court said:
Thus, when litigants through court intercession create, protect or increase a fund for the benefit of a class of which they are members, in good conscience the cost of the proceedings should be visited in proper proportion upon all such assets. A benefit to all should carry with it a proper charge to all. [at 469]
In the present case the taxpayer plaintiffs have created a fund which is of indirect benefit to all of the taxpayers of Atlantic City. Their suit advanced the interest of all; the prospects for their individual benefit were minimal. It is fair that fees be paid from the fund; all beneficiaries then share this expense. In addition, Sarner stands for the proposition that "it is not necessary that the fund be actually and physically in court; it is sufficient if, as a result of plaintiffs' action, the fund is brought within the control of the court," a circumstance found here. Finally, it should be noted that the counsel fees are being paid with the consent of the parties and by a defendant who is not one of the public bodies involved. Consent alone would not authorize the payment; I am obliged to approve all terms of settlement in a taxpayers' action. However, it is a factor lending additional support to the allowance of the fees and they are allowed.
A real estate appraiser was employed by plaintiffs and would appear to have been a necessary witness for them. The settlement agreement permits an application to this court for the payment of his fees out of the settlement monies to the extent that I consider reasonable. That application has been made. *539 However, I have requested additional details covering the appraiser's qualifications and services. In addition, I have appointed an independent expert appraiser to review the fee request, at the expense of the applicant. There has been no opportunity to receive his report. Consequently, the decision with respect to the allowance of appraisal fees is reserved.