902 A.2d 253 (2006)
386 N.J. Super. 462
BUILDERS LEAGUE OF SOUTH JERSEY, INC., a New Jersey non-profit corporation, Plaintiff-Respondent,
v.
GLOUCESTER COUNTY UTILITIES AUTHORITY, in the County of Gloucester a municipal corporation of the State of New Jersey, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued Telephonically June 6, 2006.
Decided July 13, 2006.
*254 Ben D. Shiriak, argued the cause for appellant, Glen Eyre at Monroe, L.L.C. (Shiriak & Timins, attorneys; Mr. Shiriak, on the brief).
Robert M. Washburn argued the cause for respondent, Builders League of South Jersey (Flaster Greenberg, attorneys, Cherry Hill; Mr. Washburn, of counsel; Mr. Washburn and Tracy A. Siebold, Voorhees, on the brief).
Edward J. Buzak, Montville, argued the cause for respondent, Gloucester County Utilities Authority.
Before Judges WEISSBARD, WINKELSTEIN and SAPP-PETERSON.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
In this case, the Builders League of South Jersey sued the Gloucester County Utilities Authority (the Authority), challenging the Authority's sewer connection fees. The parties arrived at a proposed settlement, which established a sewer connection fee of $1486. Following a "fairness hearing" in the Law Division, Judge Stanger approved the settlement.
On appeal, Glen Eyre at Monroe, L.L.C. (Glen Eyre), a developer that objected to the settlement in the Law Division, challenges *255 both the use of a fairness hearing as a means to approve the settlement and the fairness of the settlement itself. We concur with the trial court that the fairness hearing was an appropriate vehicle to evaluate the settlement, and under the facts as presented at that hearing, the settlement was fair and reasonable and in compliance with the controlling law. Accordingly, we affirm.
The Authority, which commenced operations in 1973, provides sanitary sewerage service to portions of Gloucester County. It services at least sixteen participating public entity customers and several industrial customers. The Builders League is a non-profit corporation whose members are engaged in construction in New Jersey. Glen Eyre, not a member of the Builders League, has received approvals to construct a large subdivision in Monroe Township, Gloucester County, which requires connection to the sanitary sewer system operated by the Monroe Municipal Utilities Authority (the Monroe MUA), a public entity customer directly serviced by the Authority.
Pursuant to N.J.S.A. 40:14B-22, a provision of the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1 to -78, a utilities authority has the power to charge a connection fee, sometimes called a tapping fee, for each property connecting to the sewerage system. The connection fee
shall be uniform within each class of users ... and the amount [of the fee] shall not exceed the actual cost of the physical connection, if made by the authority, plus an amount computed in the following manner to represent a fair payment towards the cost of the system:
a. The amount representing all debt service, including but not limited to sinking funds, reserve funds, the principal and interest on bonds, and the amount of any loans and the interest thereon, paid by the municipal authority to defray the capital cost of developing the system as of the end of the immediately preceding fiscal year of the authority shall be added to all capital expenditures made by a municipal authority not funded by a bond ordinance or debt for the development of the system as of the end of the immediately preceding fiscal year of the authority.
b. Any gifts, contributions or subsidies to the authority received from, and not reimbursed or reimbursable to, any federal, State, county or municipal government or agency or any private person, and that portion of amounts paid to the authority by a public entity under a service agreement or service contract which is not repaid to the public entity by the authority, shall then be subtracted.
c. The remainder shall be divided by the total number of service units served by the authority at the end of the immediately preceding fiscal year of the authority, and the results shall then be apportioned to each new connector according to the number of service units attributed to that connector. In attributing service units to each connector, the estimated average daily flow of sewage for the connector shall be divided by the average daily flow of sewage from the average single family residence in the authority's district, to produce the number of service units to be attributed. [N.J.S.A. 40:14B-22.]
The connection fee must be paid by new connectors to the system and "represent a fair payment towards the cost of the system." N.J.S.A. 40:14B-22. The "fair payment" is determined through the application of N.J.S.A. 40:14B-22a, b and c, and it is "apportioned to each new connector according to the number of service units *256 attributed to that connector." N.J.S.A. 40:14B-22c. A "service unit" is essentially a single family home. The connection fee is expressed in dollars per "equivalent domestic consumer units" or EDCUs. The statutory formula to determine the fee may be expressed as follows:
 Connection fee = debt service (¶ a) minus payments (¶ b)
 total number of service units (¶ c)
The connection fee shall "be recomputed at the end of each fiscal year of the authority, after a public hearing" and a "revised connection fee may be imposed upon those who subsequently connect in that fiscal year to the system." N.J.S.A. 40:14B-22.
The settlement agreement at issue here arose out of a lawsuit the Builders League filed against the Authority challenging a $2000 connection fee. The Builders League alleged that the Authority failed to comply with N.J.S.A. 40:14B-22 in calculating the fee. After the Builders League filed its lawsuit, Glen Eyre filed its own complaint against the Authority and the Monroe MUA challenging the fee.[1] Notwithstanding that litigation, Glen Eyre moved to intervene in this case. Though the trial judge denied the motion, he required the Authority and the Builders League to provide Glen Eyre with copies of all discovery and permitted Glen Eyre to submit an amicus brief.
The Builders League and the Authority have agreed in writing to a proposed settlement establishing a connection fee of $1486. Glen Eyre was not party to the settlement discussions, nor did it agree with the amount of the proposed settlement.
In response to the request by the Builders League and the Authority to approve the settlement, the court ordered a "fairness hearing" to evaluate the settlement, and "to further review, hear, and consider public comments and objections to the Settlement Agreement to facilitate its final approval and the eventual entry of a Final Judgment." The order also established a time for public inspection of the written settlement agreement and required that the following notice be sent to all interested parties, including Glen Eyre.
Any interested party, and any property owner in the [Authority] service area, may file comments and objections to the proposed Settlement Agreement, and may appear at the Fairness Hearing and present evidence in support of such objections and cross-examine witnesses appearing on behalf of the moving parties. Objections must be filed in writing, together with copies of any supporting affidavits or documents, with [the trial judge]....
This Notice ... is intended to inform all interested parties of the submission of the proposed Settlement Agreement by [the Authority] and of the review and approval by the Court of [the Authority's] revised sewer connection fee. It does not indicate any view by the Court as to the merits of the proposed Settlement Agreement or revised sewer connection fee, its compliance with the sewer connection fee statute, or whether the Court will approve the Settlement Agreement and revised sewer connection fee or enter a Final Judgment in this matter.
*257 Before we address the procedure used by the judge to approve the settlement, and the fairness of the settlement itself, we briefly discuss Glen Eyre's argument that the judge erred by denying its motion to intervene as of right.[2]See R. 4:33-1.
To intervene as of right, the movant must:
(1) claim "an interest relating to the property or transaction which is the subject of the [litigation]," (2) show he is "so situated that the disposition of the [litigation] may ... impair or impede his ability to protect that interest," (3) demonstrate that the "applicant's interest" is not "adequately represented by existing parties," and (4) make a "timely" application to intervene.
[Meehan v. K.D. Partners, L.P., 317 N.J.Super. 563, 568, 722 A.2d 938 (App. Div.1998) (quoting Chesterbrooke Ltd. P'ship v. Planning Bd. of Twp. of Chester, 237 N.J.Super. 118, 124, 567 A.2d 221 (App.Div.), certif. denied, 118 N.J. 234, 570 A.2d 984 (1989)).]
"As the rule is not discretionary, a court must approve an application for intervention as of right if the four criteria are satisfied." Ibid. The rule is liberally construed. Am. Civil Liberties Union of N.J., Inc., v. County of Hudson, 352 N.J.Super. 44, 67, 799 A.2d 629 (App.Div.), certif. denied, 174 N.J. 190, 803 A.2d 1162 (2002).
Here, Glen Eyre fails to satisfy the third prong of the test; that its interest is not adequately represented by the existing parties. See Meehan, supra, 317 N.J.Super. at 568, 722 A.2d 938. Glen Eyre's position is essentially that of the Builders Leaguethat the Authority failed to properly follow N.J.S.A. 40:14B-22 when it adopted the $2000 connection fee. Each entity had a defined interest in the outcome of the litigation; both the members of the Builders League and Glen Eyre were users and/or potential users of the sewerage system. The Builders League was in as good a position as Glen Eyre to prosecute the lawsuit.
It is also significant that the Authority provided all interested persons, including Glen Eyre, with an opportunity to be heard. See White Birch Realty Corp. v. Gloucester Twp. Mun. Utils. Auth., 80 N.J. 165, 184, 402 A.2d 927 (1979) (better practice when revising connection fees is to notice all persons with an interest in the proceeding and provide them with an opportunity to be heard). As we will next discuss, Glen Eyre was given a full opportunity to be heard, not only as an amicus but as an objector to the proposed settlement. The trial court afforded Glen Eyre substantially the same rights it would have had if it was a party. Under these circumstances, we do not find error in the court's refusal to permit intervention.
We next discuss what we consider to be the most significant issue on appeal, Glen Eyre's challenge to the use of the fairness hearing to evaluate the settlement; Glen Eyre asserts a trial with its concomitant discovery and other procedural safeguards was required. We are not convinced by that argument. Given the opportunity of not only Glen Eyre but all potential objectors to the connection fee to participate in the fairness hearing and express their objections, we conclude that *258 the fairness hearing was an appropriate vehicle to permit the court to examine the fairness of the proposed settlement.
The order establishing the fairness hearing required that notice be provided to all potential objectors of the time and place of the hearing. The objectors were afforded an opportunity to be heard, submit evidence, and cross-examine witnesses.
The hearing took place over two days, May 17 and May 18, 2004. At the May 17 hearing, the court questioned whether anyone in the courtroom, other than Glen Eyre, wished to participate in the hearing; no one responded. Glen Eyre was represented by an attorney at the hearing who was given multiple opportunities to present witnesses and cross-examine witnesses of the other parties. Upon completion of the testimony of the experts for the Builders League and the Authority, Ronald Ghrist and Charles J. Ferraioli, respectively, Glen Eyre's counsel was asked by the court if he had any witnesses to present, other than Daniel Kelly, Glen Eyre's expert. Counsel responded that he did not.
During the May 18 hearing, the judge advised Glen Eyre's counsel that he could present "as many witnesses as he wants to present...." Counsel was told he could "put[] in whatever evidence he needs to put in, subject obviously to the rules of evidence." Counsel again said the only witness he would call would be Daniel Kelly.
Upon completion of the hearing, the judge issued a written opinion approving the settlement. The Authority then adopted a resolution establishing the $1486 sewer connection fee for its 2004 fiscal year.
While our research has unearthed no case law that discusses the use of a fairness hearing as it applies to the approval of a settlement of a lawsuit challenging a utilities authority's connection fee, such a hearing has been used in other contexts. For example, this type of hearing has been used to approve class action settlements. Morris County Fair Hous. Council v. Boonton Twp., 197 N.J.Super. 359, 369-71, 484 A.2d 1302 (Law Div.1984). In Morris County Fair Hous., supra, Judge Skillman, then sitting as a trial judge, described a fairness hearing as follows:
The hearing on the proposed settlement is not a plenary trial and the court's approval of the settlement is not an adjudication of the merits of the case. Rather, it is the court's responsibility to determine, based upon the relative strengths and weaknesses of the parties' positions, whether the settlement is "fair and reasonable," that is, whether it adequately protects the interests of the persons on whose behalf the action was brought.
[197 N.J.Super. at 370, 484 A.2d 1302 (internal citations omitted).]
In making a fairness determination, a trial court "must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case." Armstrong v. Bd. of School Dirs. of Milwaukee, 616 F.2d 305, 314-15 (7th Cir. 1980), overruled on other grounds by, Felzen v. Andreas, 134 F.3d 873 (7th Cir. 1998). Quoting from City of Detroit v. Grinnell Corp., 495 F.2d 448, 462 (2d Cir. 1974), the Armstrong court observed that in a fairness hearing, the reviewing court "`must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" Id. at 315.
This approach has been taken in this State not only in the context of class action settlements, but also to review settlements of land use litigation. See Warner Co. v. *259 Sutton, 274 N.J.Super. 464, 483, 644 A.2d 656 (App.Div.1994) (approved use of fairness hearing to review settlement proposal of a lawsuit challenging a zoning ordinance); see also Gandolfi v. Town of Hammonton, 367 N.J.Super. 527, 542, 843 A.2d 1175 (App.Div.2004) (in view of strong judicial policy favoring settlement of litigation, fairness hearing is appropriate so long as the public's right to notice and to be heard is accommodated); cf. Livingston Builders, Inc. v. Twp. of Livingston, 309 N.J.Super. 370, 375-76 n. 4, 707 A.2d 186 (App.Div.1998) (fairness hearing appropriate to approve settlement of Mount Laurel exclusionary zoning suits; see e.g., Southern Burlington County N.A.A.C.P. v. Twp. of Mount Laurel, 67 N.J. 151, 336 A.2d 713, appeal dismissed and cert. denied, 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mount Laurel I)).
We agree with the trial court here that the same procedure was appropriate to approve the settlement of the proposed connection fee. While Glen Eyre argues that a plenary trial should have been conducted, that position is contrary to the strong judicial policy favoring settlements. See Gandolfi, supra, 367 N.J.Super. at 542, 843 A.2d 1175.
The purpose of the fairness hearing is to assure that the settlement is reasonable, not to adjudicate the case on its merits. Use of such a hearing in the context of establishing a sewer connection fee allows for expeditious resolution of the dispute without the necessity of a lengthy and expensive trial process. It affords stability to an authority and its users; the authority can collect the fees, which it requires to operate, and the potential users of the system can plan for the costs.
Glen Eyre, along with all interested parties, was given notice of the hearing and an opportunity to appear, present witnesses, and cross-examine the other parties' witnesses. The hearing protected the public's interest while balancing the rights and concerns of the parties. Under the circumstances, a fairness hearing to evaluate the settlement was appropriate.
That takes us to whether the trial court's determination that the settlement agreement was fair and reasonable was supported by the evidence presented at the hearing. Glen Eyre claims the settlement cannot be approved because the formula in N.J.S.A. 40:14B-22 was not literally followed. We find no merit to this argument.
While the sewer connection fee formula established in N.J.S.A. 40:14B-22 appears to be straightforward, merely requiring the insertion of readily obtainable data, here not all of the necessary data was available. The exact number of EDCUs in the system, a significant component of the formula, was unknown because the Authority did not keep records of how many service units were connected to the system between the Authority's inception in 1973 through December 31, 1978. In other words, to arrive at a connection fee, N.J.S.A. 40:14B-22 calls for the debt service minus certain payments (the numerator) to be divided by the total number of service units (the denominator). In the absence of records of the number of service units connected to the system prior to December 31, 1978, it was impossible to accurately determine the denominator.
That being so, the denominator of the formula necessarily had to be based on estimates. The methodology to arrive at those estimates was a hotly contested issue at the fairness hearing. The experts at the hearing expressed their opinions as to the means to be used to arrive at an estimate of the number of service units in the system. After extensive testimony, the trial court accepted the methodology *260 suggested by the experts for the Builders League and the Authority, and rejected the methodology suggested by Glen Eyre's expert. While we will not repeat the complex and technical testimony of the experts, the court found 58,346 service units in the system as of October 31, 2002, to which it added 1440 service units for the 2003 fiscal year for a total of 59,786 service units as of October 31, 2003. The judge gave reasons for rejecting Kelly's testimony and accepting the testimony of Ghrist and Ferraioli. The credible evidence in the record supports the court's conclusion. See Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974).
The other serious issue of contention at the fairness hearing was the computation of the numerator of the formula. The numerator is determined by adding the system debt service payments and the capital expenditures, and subtracting "gifts, contributions or subsidies" received by the Authority. N.J.S.A. 40:14B-22a & b. No dispute exists that the debt capital base equaled $88,836,431; the question presented to the court was whether payments to the Authority from the municipal participants in the system should be deducted from that base. Kelly opined that they should be, while Ghrist and Ferraioli testified that the payments by the sixteen participating municipal entities were not contributions to capital, but were simply pass-throughs of the user service fee. In other words, the municipal participants act as collection agents for the servicing charges. The court rejected Kelly's testimony and accepted that of Ghrist and Ferraioli. The judge found:
The Court concludes that these collected amounts represent "sewage service charges", which are statutorily authorized under the first part of the statute. The end result of Glen Eyre's proposal, carried to its logical conclusion would be that at some point, there would be no connection fee because all of the service charges received from the GCUA from the 16 participants would exceed the aggregate debt service and capital expenditures. That would, at some point, have new users connecting for free. While that may be a very advantageous position for a developer such as Glen Eyre, this Court does not believe that the original existing users should be subsidizing new connections.
That determination was supported by the credible evidence in the record and should not be disturbed. Rova Farms, supra, 65 N.J. at 484, 323 A.2d 495.
Glen Eyre also challenges the provision of the settlement agreement that permits the service capital expenditure figure of $88,836,431, and the number of EDCUs59,786 service units as of October 31, 2003to be used as a base for recomputation of a new sewer connection fee for subsequent years. Glen Eyre claims this procedure is not in conformity with N.J.S.A. 40:14B-22. We disagree. We do not interpret the statutory requirement that the fee be recomputed each year to mean that a utilities authority must revise its calculations for prior years. It may rely on those prior calculations and add or deduct from them, as appropriate, additional debt service, payments to the utilities authority under N.J.S.A. 40:14B-22b, and the number of new service units for each new fiscal year. Glen Eyre's position that these figures should be recalculated from scratch each year would not only be impractical, but would lead to instability and uncertainty for users and potential users of the system.
Finally, we address Glen Eyre's argument that the refund provided by the settlement agreement should be retroactive to January 1, 2000, the date the *261 $2000 sewerage connection fee took effect. The settlement agreement permits a refund for a $514 overchargethe difference between the $2000 connection fee and the $1486 approved connection fee for the 2004 fiscal yearto "any person or entity which paid for a sewer connection permit from and after 1 November 2003."
Glen Eyre's claim that the refund should be retroactive to January 1, 2000 is without merit. The fiscal year to which the settlement applies runs from November 1, 2003 to October 31, 2004. The refund period mirrors the affected fiscal year for the new connection fee. The settlement permits any entity that connected during the applicable fiscal year and paid the $2000 charge to receive a refund. It was therefore not unreasonable to limit the refund to payments made after November 1, 2003.
Affirmed.
NOTES
[1] That complaint, Glen Eyre at the Arbours, L.L.C. v. Gloucester County Utils. Auth., No. GLO-L-232-03, is pending.
[2] Glen Eyre did not claim permissive intervention under Rule 4:33-2 before the Law Division or on appeal before this court. We view Glen Eyre's application to intervene solely under Rule 4:33-1, intervention as of right. See State v. J.M., 182 N.J. 402, 410, 866 A.2d 178 (2005) (issue not raised in trial court, even constitutional issue, ordinarily not considered on appeal).