NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0357-20

IN THE MATTER OF THE
APPLICATION OF THE
TOWNSHIP OF
BORDENTOWN, COUNTY
OF BURLINGTON.

_____

APPROVED FOR PUBLICATION

March 14, 2022

APPELLATE DIVISION

Argued February 9, 2022 – Decided March 14, 2022

Before Judges Sumners, Vernoia and Firko.

On appeal from the Superior Court of New Jersey,
Law Division, Burlington County, Docket No. L-
1579-15.

Bruce I. Afran argued the cause for appellant Mark
Bergman.

Michael J. Edwards argued the cause for respondent
The Township of Bordentown (Surenian, Edwards &
Nolan LLC, attorneys; Michael J. Edwards, of counsel
and on the brief; AnnMarie Harrison, on the brief).

Joshua D. Bauers argued the cause for respondent Fair
Share Housing Center (Fair Share Housing Center,
attorneys; Bassam F. Gergi, of counsel and on the
brief).

The opinion of the court was delivered by

FIRKO, J.A.D.

In this <u>Mount Laurel</u>[1] case, defendant-intervenor Mark Bergman appeals from the final judgment of compliance and repose entered by the Law Division on August 27, 2020, in accordance with <u>Mount Laurel IV</u>, 221 N.J. at 30. The final judgment approved an amended settlement agreement between plaintiff, the Township of Bordentown (the Township), and the Fair Share Housing Center (FSHC). The agreement established the Township's Third Round fair share obligation for affordable housing and provided a plan for its compliance. In this opinion, we address the parameters of a fairness hearing and judicial approval of a settlement involving the FSHC in the absence of Third Round rules being promulgated by the Council on Affordable Housing (COAH).

On appeal, Bergman argues the trial court erred by denying his request to testify at the fairness hearing and finding the settlement fairly and reasonably protects the interests of low-income individuals. He also contends special master Mary Beth Lonergan, A.I.C.P., P.P., had a conflict of interest because she, or others in her firm, were simultaneously representing dozens of municipalities in affordable housing settlement negotiations. We disagree and affirm.

---

[1] "The <u>Mount Laurel</u> series of cases recognized that the power to zone carries a constitutional obligation to do so in a manner that creates a realistic opportunity for producing a fair share of the regional present and prospective need for housing low- and moderate-income families." <u>In re N.J.A.C. 5:96 & 5:97</u>, (<u>Mount Laurel IV</u>), 221 N.J. 1, 3-4 (2015) (footnote omitted).

## I.

On July 2, 2015, the Township filed a verified complaint seeking a declaratory judgment that it satisfied its fair share of affordable housing for its Third Round Mount Laurel obligation, pursuant to COAH's 2014 calculation, and it is immune from prospective litigation.[2]  On November 12, 2015, the

---

[2]  Third Round refers to a municipality's Mount Laurel obligation between the years of 1999 and 2025.  See In re Declaratory Judgment Actions Filed By Various Muns., 227 N.J. 508, 531 (2017).

In 1999, COAH's Second Round rules expired.  In re Adoption of N.J.A.C. 5:96 & 5:97 ex rel. New Jersey Council on Affordable Hous. (Mount Laurel IV), 221 N.J. 1, 8 (2015).  As such, promulgation of COAH's Third Round rules was originally due in 1999.  Ibid.  Although COAH twice attempted to adopt Third Round rules, first in 2004, see 36 N.J.R. 5895(a) (Dec. 20, 2004), and then in 2008, see 40 N.J.R. 237(a) (Jan. 22, 2008); 40 N.J.R. 515(a) (Jan. 22, 2008), reviewing courts found several key aspects of COAH's two attempted Third Round rules "to be invalid and violative of the Mount Laurel doctrine."  In re Declaratory Judgment Actions, 227 N.J. at 514-15 (citing In re Six Month Extension of N.J.A.C. 5:91–1 et seq., 372 N.J. Super. 61 (App. Div. 2004); In re Adoption of N.J.A.C. 5:94 & 5:95 (In re N.J.A.C. 5:94 & 5:95), 390 N.J. Super. 1 (App. Div. 2007); In re Adoption of N.J.A.C. 5:96 & 5:97, 416 N.J. Super. 462 (App. Div. 2010)).  Consequently, for sixteen-plus years, "COAH failed to adopt a set of valid regulations to govern the" Third Round.  Ibid.

In response, on March 14, 2014, the Court directed COAH if it "did not adopt Third Round [r]ules by November 17, 2014, the Court would entertain applications for relief . . . . [and] 'if such a request [was] granted, actions may be commenced on a case-by-case basis before the Law Division or in the form of "builder[']s remedy" challenges.'"  See Mount Laurel IV, 221 N.J. at 9-10 (fifth alteration in original) (quoting In re Adoption of N.J.A.C. 5:96 & 5:97, 220 N.J. 355, 355-56 (2014)).

FSHC moved to intervene. Bergman, doing business as Sage Builders, Inc., entered into an option agreement on April 27, 2017, to purchase 17.04 acres of unimproved real property located at block 92.01, lot 18, on Route 528 in the Township (the property) for the purpose of constructing 250 residential units, which would include forty affordable housing units. He filed a motion to intervene, which the trial court granted. The court also appointed Lonergan as a special master in the case.

Following immunity and intervention proceedings, the parties engaged in extensive negotiations. At the time, the property was "zoned as R-120 Low Density Residential." The Township wanted to acquire the property for its Green Acres open space preservation program. On April 3, 2017, the Township awarded a contract for the appraisal of the property to J. McHale and Associates, LLC. The property appraisal indicated "a maximum of [thirteen] building lots" would be permitted under current zoning regulations.

The option agreement provided Bergman nine months—until January 27, 2018—to acquire all rights in the property under the terms and conditions set forth in the agreement. Bergman could extend the initial option period for an additional nine months by notifying the owner "in writing no later than ten . . . business days prior to the expiration of the" option agreement—January 17, 2018—and making four $37,500.00 payments upon exercising the extended

A-0357-20

option period and "at [seventy-five] day intervals thereafter," for a total sum of $150,000.00. Failure to extend the initial option period in writing by January 17, 2018, would automatically result in termination of the option on January 27, 2018.

Between May and June 21, 2017, the Township and Bergman had preliminary discussions relative to his proposed development. Bergman did not file an application to rezone the property or seek site plan approval regarding his proposal. The Township informed Bergman it was in the process of determining its affordable housing obligation.

On June 26, 2017, the Township and FSHC[3] entered into a settlement agreement (the agreement), which set forth the Township's total affordable housing obligations and provided a compliance plan in order to meet those obligations. The agreement recognized the Township had the following affordable housing obligations:

REHABILITATION OBLIGATION        11

PRIOR ROUND OBLIGATION

---

[3] In <u>Mount Laurel IV</u>, the Court endorsed FSHC's interest in the Third Round proceedings under review. The Court explained, "If a municipality seeks to obtain an affirmative declaration of constitutional compliance, it will have to do so on notice and opportunity to be heard to FSHC and interested parties." 221 N.J. at 24. Trial courts "will be assisted in rendering [their] preliminary determination[s] on need by the fact that all initial and succeeding applications will be on notice to FSHC and other interested parties." <u>Id.</u> at 23.

A-0357-20

(pursuant to N.J.A.C. 5:93)  211

THIRD ROUND (1999-2025)
PROSPECTIVE NEED, WHICH
INCLUDES THE GAP PERIOD
PRESENT NEED, RECOGNIZED BY
THE SUPREME COURT, In re
Declaratory Judgment Actions
Filed by Various Municipalities,
227 N.J. 508 (2017)  425

In order to satisfy the Township's Third Round prospective need of 425 units, the agreement identifies multiple compliance mechanisms, including: (1) surplus credits (round two), consisting of residual credits resulting from the Bradford Point site[4] for ten units with a rental bonus credit of ten (ten in total); (2) Volunteers of America (VOA) – 1, a senior rental for sixty-four units and special needs for five units (sixty-nine units in total) with a rental bonus credit of five; (3) the Bordentown Waterfront Community (BWC) residual credits, a family or senior rental with eighteen units; (4) the Zieger project, for 227 units, thirty-six units to be affordable housing; (5) the Nissam project, for 230 units, forty units to be affordable housing and over 13% affordable housing to very low-income families; (6) group home (bedrooms) designated for special

---

[4] "The Bradford Pointe Court development was approved in 2001 and constructed in 2002 to satisfy the conditions contained in the August 16, 2000 [j]udgment of [c]ompliance and [r]epose and the entirety of the Township's [p]rior [r]ound obligation. This site is identified as block 139, lot 11 on the official tax map of the Township."

needs, consisting of twenty units and sixteen rental bonus credits; (7) an inclusionary family rental development for fifty-nine units; and (8) VOA-2, a family rental development based on sixty-six units.

Bergman's property was not included in the agreement. Therefore, he chose not to meet any further with the Township's representatives relative to his development plan for the property. On September 1, 2017, Bergman filed an objection to the Township's proposed settlement and compliance plan and sought to include the property in the Township's affordable housing allocation.

On May 18, 2018, Bergman's attorney submitted a letter to the court advising he and his client "would not be appearing at the fairness hearing but that [Bergman] wished to make a statement." On June 12, 2018, Bergman submitted a pro se written statement of his objections to the proposed settlement to the court.

At the June 18, 2018 fairness hearing, the trial court permitted Bergman to make a statement and cross-examine witnesses. The judge addressed Bergman's arguments and explained:

> [First], [Bergman's concerns are] not directly in front of me today. What's in front of me today is whether there is a realistic opportunity for affordable housing, [which] I think that there is based on [special master] Lonergan's testimony.
>
> [Second], and I have this in other cases. I have it even being more actively litigated than this. It's—

7

and I get the impression you're in the real estate business, so you know that things change, just like the rest of life and if something changes here then we'll come back and we'll have to see.

. . . .

[Third,] you may be right. As a matter of fact, I would be surprised if you were not right, that some of these things are not going to happen, but then the question is what is going to happen?

And I think that response to your concerns, I'm not going to get into whether I think your policy arguments are right or wrong because I don't really think that's the role of the Court. . . . I'm not here for policies. I'm here to do what the Supreme Court says.

So based upon this[,] I do find that there's a realistic opportunity.

On June 29, 2018, the trial court entered an order approving the Township's settlement with the FSHC based on Lonergan's testimony. The court noted the agreement's fair share methodology reduced the Township's Third Round obligation by thirty-two percent "as an incentive to settle the case," which it had "been amendable to . . . in lieu of litigating the appropriate fair share methodology."

Notwithstanding entry of the order, during a court conference, the judge "directed the parties to engage in discussions to see whether . . . [Bergman]'s

8

proposed site could be included in the settlement."[5]   In September 2017, negotiations commenced and ultimately resulted in a proposal by the Township permitting Bergman "to build eighty units on the property."   These units, however, "would not be affordable units, but would be market rate units." Bergman rejected the proposal "because he wanted to buil[d] affordable [units] as part of the project."

On January 17, 2018, Bergman did not notify the property's owner in writing of his intention to extend the initial option period, as required in the option agreement.   A week later on January 24, 2018, the Township announced it was ceasing all negotiations with Bergman regarding the property and his proposed development.   Three days later, on January 27, 2018, Bergman's option agreement expired.   After Bergman's option agreement expired and was not renewed by him, the property's owner reentered into negotiations with the Township for its purchase of the property, which culminated in the sale of the property to the Township on May 3, 2018.

On June 7, 2019, Bergman filed a motion to set aside the trial court's June 29, 2018 order and argued:  (1) "during the court-ordered negotiations [the Township] had taken undisclosed measures to acquire [the property] for

---

[5] The record does not reflect the date of the court conference.

A-0357-20

itself for the purpose of preventing housing at that location;" and (2) the Township "had interfered in [his] ability to advocate for inclusion of the site in the affordable housing settlement."[6]

On June 11, 2019, the Township and FSHC entered into an amended agreement, unrelated to Bergman's motion, which was submitted to the trial court on June 18, 2019, for approval. The amended agreement also provided for 425 units to satisfy the Township's Third Round obligation. In sum, the Township's Third Round sites included:

- Affordable housing credit for ten existing family rental homes, plus ten bonus credits from Bradford Pointe, a 100% affordable development, plus ten bonus credits

- Sixty-nine existing homes, comprised of sixty-four age-restricted rentals and five special needs units, plus five bonus credits for the special needs units from a 100% affordable development with VOA

- Eighteen proposed family or age-restricted rental homes from an inclusionary development, BWC

- Thirty-six proposed family rental homes, plus thirty-six bonus credits, from an inclusionary development with Zieger

---

[6] Bergman claims he filed his motion to set aside the order on June 14, 2019.

- Forty proposed family rental homes, plus forty bonus credits, from an inclusionary development with Nissim

- Nineteen proposed age-restricted homes from an inclusionary development with Kevin Johnson Senior Project

- Fourteen group homes

- Ten proposed family homes to be constructed by Habitat for Humanity

- Eleven proposed market-to-affordable homes

- Sixty-five proposed rental homes to be built as a 100% affordable development by VOA, which was to be publicly subsidized

A new fairness hearing was requested to address modifications to the proposed amended agreement and to "determine whether the [a]mend[ed] [agreement] [was] fair and reasonable to the interest of the region's low- and moderate-income households, while simultaneously determining whether [the Township's fair share plan], as a whole, creates a realistic opportunity for the construction of the Township's fair share of the regional need."

On August 9, 2019, the parties entered into a consent order to set aside Bergman's motion because the June 29, 2018 order became moot since a new fairness hearing was required as a result of the proposed amended settlement. As part of the parties' consent order, Bergman was "entitled to be heard and

11

offer lay testimony and expert witnesses and cross-examine witnesses at any [fairness hearing] held in this matter."

On October 16, 2019, the trial court commenced the fairness hearing over three non-sequential days.[7] During the second day of the fairness hearing, the trial court rejected Bergman's request to testify because his arguments were limited to his "personal situation." The trial court reiterated its function was solely to determine "whether or not [the amended agreement] was a fair agreement that provides a realistic opportunity for low[-] and moderate[-] income housing." The trial court added: "There is nothing that obligates a town to go with a specific development plan, as opposed to another one, provided that [the chosen plan] provides the opportunity for realistic low[-] and moderate[-] income housing."

Special master Lonergan testified in response to both the fairness of the amended settlement agreement and Bergman's arguments, which were previously summarized in an October 14, 2014 email to her. Lonergan recommended the trial court approve the amended settlement agreement and noted the housing element of the Fair Share Plan provided a realistic opportunity for the Township to construct its fair share of the regional need for

---

[7] The second fairness hearing was held on October 16, November 15, and November 19, 2019.

A-0357-20

affordable housing. On December 10, 2019, the trial court entered a conditional order of judgment of compliance and repose, which incorporated the amended settlement agreement. The parties were directed to inform the court after the terms of the conditional order were satisfied. On August 7, 2020, the trial court entered the final judgment of compliance and repose, which is the judgment under review. This appeal followed.

## II.

A final determination made by a trial court conducting a non-jury case is "subject to a limited and well-established scope of review." Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). We review a trial court's interpretation of law de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). However, "we give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015). We will "not disturb the factual findings and legal conclusions of the trial judge unless" convinced that those findings and conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App. Div. 1963)).

A trial court's decision to approve a proposed settlement agreement is reviewed for abuse of discretion.[8] Chattin v. Cape May Green, Inc., 216 N.J. Super. 618, 628 (App. Div. 1987) (reviewing a class action settlement); Builders League of S. Jersey, Inc. v. Gloucester Cnty. Utils. Auth., 386 N.J. Super. 462, 471-72 (App. Div. 2006) (noting fairness hearings for class action settlements and land use litigation to be the same) (citing, in part, S. Burlington Cnty. N.A.A.C.P. v. Mount Laurel Twp. (Mount Laurel I), 67 N.J. 151 (1974)). The trial court's role is to approve or reject the proposed settlement in its entirety as written and the court may not revise or amend particular provisions. See Tabaac v. City of Atl. City, 174 N.J. Super. 519, 524 (Law Div. 1980); In re Cendant Sec. Litig., 109 F.Supp. 2d. 235, 255 (D.N.J. 2000).

Trial courts have broad discretion when reviewing a municipality's Mount Laurel fair share plan for constitutional compliance. Mount Laurel IV, 221 N.J. at 30. And, trial "courts should endeavor to secure, whenever possible, prompt voluntary compliance from municipalities." Id. at 33. A trial court's factual "findings should not be disturbed 'when supported by adequate, substantial and credible evidence.'" Toll Bros. v. Twp. of W. Windsor, 173

---

[8] Without citing to any case law or legal authority, Bergman erroneously contends a trial court's approval of a municipality's Fair Share Plan is subject to de novo review.

N.J. 502, 549 (2002) (quoting <u>Rova Farms Resort</u>, 65 N.J. at 484). Matters of law, however, "are subject to a de novo review." <u>Ibid.</u> (quoting <u>Balsamides v. Protameen Chems., Inc.</u>, 160 N.J. 352, 372 (1999)).

A trial court must conduct a fairness hearing before it approves a municipality's <u>Mount Laurel</u> Fair Share Plan. <u>Livingston Builders, Inc. v. Twp. of Livingston</u>, 309 N.J. Super. 370, 374 (App. Div. 1998). The sole purpose of a fairness hearing is to assess "whether the settlement is 'fair and reasonable,'" i.e., "whether it adequately protects the interests of the persons on whose behalf the action was brought." <u>Sutter v. Horizon Blue Cross Blue Shield of N.J.</u>, 406 N.J. Super. 86, 101-02 (App. Div. 2009) (reviewing settlement between health insurer and class representative) (quoting <u>Morris Cnty. Fair Hous. Council v. Boonton Twp.</u>, 197 N.J. Super. 359, 369-71 (Law Div. 1984)); <u>see also</u> <u>Builders League of S. Jersey</u>, 386 N.J. Super. at 471-72 (noting fairness hearings for class action settlements and land use litigation to be the same). <u>Cf.</u> <u>Mount Laurel I</u>, 67 N.J. 151.

A municipality's fair share plan settlement is fair and reasonable when it "adequately protects the interests of lower-income persons on whose behalf the affordable units proposed by the settlement are to be built." <u>E./W. Venture v. Borough of Fort Lee</u>, 286 N.J. Super. 311, 328 (App. Div. 1996). A fairness hearing requires the trial court to consider: (1) "the number of affordable

A-0357-20

housing units being constructed"; (2) "the methodology by which the number of affordable units has been derived"; (3) "any other contribution being made by the developer to the municipality in lieu of affordable units"; (4) "other components of the agreement[,] which contribute to the municipality's satisfaction of its constitutional obligation"; and (5) "any other factors[,] which may be relevant to the 'fairness' issue." Ibid. "In making a fairness determination, a trial court 'must not forget that it is reviewing a settlement proposal rather than ordering a remedy in a litigated case.'" Builders League of S. Jersey, 386 N.J. Super. at 471 (quoting Armstrong v. Bd. of Sch. Dirs. of Milwaukee, 616 F.2d 305, 314-15 (7th Cir.1980)).

In conducting a fairness hearing, a trial court has broad "discretion to 'employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement.'" Sutter, 406 N.J. Super. at 101 (quoting In re Cmty. Bank of N. Va., 418 F.3d 277, 316 (3d Cir. 2005)). "The 'nature and extent of the hearing . . . rests within the sound discretion of the court.'" Id. at 102 (quoting Boonton Twp., 192 N.J. Super. at 370); see also In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 358 n.33 (3d Cir. 2010) (noting trial courts are afforded considerable "discretion 'to employ the procedures that [the court] perceives will best permit it to evaluate the fairness of the settlement'" (quoting In re Cmty. Bank of N. Va., 418 F.3d at 316)).

16

Under Mount Laurel I, 67 N.J. at 151, a municipality has a constitutional obligation to provide a "realistic opportunity" for the development of its fair share of affordable housing. S. Burlington Cnty. N.A.A.C.P. v. Mount Laurel Twp. (Mount Laurel II), 92 N.J. 158, 221 (1983). Determining if an opportunity is "realistic" requires application of a practical and objective standard; the court must decide "whether there is in fact a likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed." Id. at 221-22. "Municipalities need not guarantee that the required amount of affordable housing will be built, but must only adopt land use ordinances that create a realistic opportunity to meet the regional need and their own rehabilitation share." In re Adopt. of N.J.A.C. 5:94 & 5:95, 390 N.J. Super. at 54.

Trial courts adjudicating Mount Laurel declaratory judgment actions "should employ flexibility in assessing a" municipality's compliance plan. Mount Laurel IV, 221 N.J. at 33. The Fair Housing Act of 1985 (FHA) and the Municipal Land Use Law authorize municipalities to use various means to provide for their "fair share of low[-] and moderate[-]income housing." N.J.S.A. 52:27D-311(a); see also N.J.S.A. 40:55D-8.7(a).

A-0357-20

A.

We first address Bergman's argument that the trial court erred by not allowing him to testify at the fairness hearing. He contends his proffered testimony was a factor "relevant to the 'fairness' issue." E./W. Venture, 286 N.J. Super. at 328. Bergman claims the term "any other factors" "embraces all evidence that reasonably relates to the fundamental fairness of the settlement" and "whether it provides a 'realistic' affordable housing opportunity." Because Bergman asserts the amended settlement agreement reduced the Township's Third Round obligations, he claims his testimony was relevant, and his proposed development could have satisfied the Township's affordable housing obligation.

The sole purpose of a fairness hearing is to assess whether the proposed "settlement is 'fair and reasonable,'" Sutter, 406 N.J. Super. at 101-02 (quoting Boonton Twp., 197 N.J. Super. at 369-71), i.e., "whether it adequately protects the interests of lower-income persons on whose behalf the affordable units proposed by the settlement are to be built," E./W. Venture, 286 N.J. Super. at 328. As such, the trial "court 'must eschew any rubber stamp approval in favor of an independent evaluation, yet, at the same time, it must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case.'" Sutter, 406 N.J. Super. at 102 (quoting Builders League of S.

Jersey, 386 N.J. Super. at 471). However, "[t]he 'nature and extent of the hearing . . . rests within the sound discretion of the court.'" Ibid. (quoting Boonton Twp., 192 N.J. Super. at 370); see also Pet Food Prods. Liab. Litig., 629 F.3d 333, 358 n.33 (3d Cir. 2010) (noting trial courts are afforded considerable discretion "to employ procedures that [the court] perceives will best permit it to evaluate the fairness of the settlement" (quoting In re Cmty. Bank of N. Va., 418 F.3d at 316)).

We discern no basis to disturb the trial court's decision barring Bergman's testimony. The court was well within its discretion in finding Bergman's proffered testimony was purely personal in nature—concerning his development project. Moreover, Bergman was allowed to participate in the fairness hearing by examining witnesses. The purpose of a fairness hearing is not to determine if there exists an alternative plan, which may more efficiently provide low-income units, but rather is restricted to the question of whether the parties' current plan provides "a realistic opportunity for the municipality to achieve its 'fair share of the present and prospective regional need for low[-] and moderate[-]income housing.'" S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel (Mount Laurel II), 92 N.J. at 205.

A-0357-20

B.

Next, Bergman argues the trial court erred by finding he "was seeking to compel, in the wrong forum, a builder's remedy." A builder's remedy provides a developer with the means to bring "about ordinance compliance through litigation." Mount Olive Complex v. Twp. of Mount Olive (Mount Olive II), 356 N.J. Super. 500, 505 (App. Div. 2003) (quoting Allan-Deane Corp. v. Twp. of Bedminster, 205 N.J. Super. 87, 138 (Law Div.1985)). A builder's remedy should be granted if: (1) the "developer succeeds in Mount Laurel litigation"; (2) the developer "proposes a project providing a substantial[9]

---

[9] "Substantial" is defined on a case-by-case basis. Mount Laurel II, 92 N.J. at 279 n.37. To determine whether the provided amount of lower income housing is substantial, trial court's should consider the following factors: (1) "the size of the [builder's] proposed project"; (2) "the percentage of the project to be devoted to lower income housing" (a percentage of 20% or higher is presumptively a reasonable percentage); (3) the "proportion of the [municipality's]'s fair share allocation [that] would be provided by the project"; and (4) "the extent to which the remaining housing in the project can be categorized as 'least cost.'" Ibid.

Here, Bergman's proposal does not include a substantial amount of lower income housing. Bergman's original proposal included 250 units, with only forty low-income units (16%). His forty low-income units would provide for merely 5.28% of the Township's fair share allocation of 757 units. Finally, the record does not reflect whether the remaining 200 units could be categorized as "lease cost." Despite the fact that Bergman describes his proposal sets forth a "substantial" and "sizeable" number of low-income units, the record does not indicate his proposal would provide the Township with the substantial number of units mandated under the Mount Laurel II factors. Ibid.

20

amount of lower income housing"; and (3) the developer's proposal is not "contrary to sound land use planning." Mount Laurel II, 92 N.J. at 279–80. A "builder's remedy [may] not be denied solely because the municipality prefers some other location for lower income housing, even if it is in fact a better site." Id. at 280. Builder remedies are granted "where appropriate, on a case-by-case basis." Id. at 218.

A developer does not have an "inherent right to a builder's remedy," however. Tanenbaum v. Twp. of Wall Bd. of Adjust., 407 N.J. Super. 446, 457 (Law. Div. 2006), aff'd, 407 N.J. Super. 371, 376 (App. Div. 2009) (affirming the trial court's "conclusions substantially on the basis of his written opinion"). A builder's remedy is only appropriate "after a [trial] court has had the opportunity to fully address constitutional compliance and has found constitutional compliance wanting." Mount Laurel IV, 221 N.J. at 35-36. Consequently, only a municipality that satisfies its Mount Laurel obligations "obtain[s] immunity from a builder's remedy." Id. at 14.

Here, the trial court noted Bergman's objections to be a "bootstrapped" builder's remedy by which to circumvent the Township's immunity. Specifically, the court noted:

> He happens to be a developer. There's a specific
> remedy for developers when it comes to [Mount]
> Laurel litigation, called a builder's remedy, if that's

21

> what he might want to do with a certain plot of land as a developer.
>
> . . . [I]t's one thing to object to the [Mount] Laurel plan on fairness grounds, but if the whole reason he's here . . . [is] as a developer, [he] want[s] [his] property in [the plan][,] [i]sn't that a builder's remedy as opposed to an objection to a fair share plan?

In response, the record shows Bergman's counsel admitted he had hoped by vacating the current fair share plan, Bergman "might actually get to the same place" as a builder's remedy "without the need for a new litigation." We are unpersuaded. The trial court's barring of Bergman's testimony was well within its discretion and does not warrant reversal.

C.

Finally, on the issue of his proffered testimony, Bergman argues the trial court erred because the Township had "manipulated out of existence an actual building opportunity." A municipality is not inherently required to rezone property for purposes of inclusionary development. See Mount Olive II, 356 N.J. Super. at 507. If a municipality can achieve its fair-share obligation without a specific property, i.e., the municipality's fair share plan is fair and reasonable without the property's inclusion, then the municipality may restrict the use of the property as reasonable. See ibid.; Mount Olive Complex v. Twp. of Mount Olive (Mount Olive I), 340 N.J. Super. 511, 538 (App. Div. 2001). In Mount Laurel II, the Court specifically held:

22

> Mount Laurel is not designed to sweep away all land use restrictions or leave our open spaces and natural resources prey to speculators. Municipalities consisting largely of conservation, agricultural, or environmentally sensitive areas will not be required to grow because of Mount Laurel. . . .
>
> As for those municipalities that may have to make adjustments in their lifestyles to provide for their fair share of low[-] and moderate[-]income housing, they should remember that they are not being required to provide more than their fair share. . . . [O]nce a community has satisfied its fair share obligation, the Mount Laurel doctrine will not restrict other measures, including large-lot and open area zoning, that would maintain its beauty and communal character.
>
> [92 N.J. at 219-20.]

A municipality achieves its fair-share obligation via its "units actually constructed, under construction, or approved by [the municipality's] final development plan." Mount Olive II, 356 N.J. 510-11. As such, so long as a municipality's fair share plan is fair and reasonable, the municipality has satisfied its Mount Laurel obligations and may restrict the use of all property not included in the plan as reasonable. But see Mount Laurel IV, 221 N.J. at 33-34 (noting if the "goal cannot be accomplished, with good faith effort and reasonable speed, . . . then the [trial] courts may authorize exclusionary zoning actions seeking a builder's remedy to proceed against the [municipality]").

Nor may a trial court order additional Mount Laurel housing absent a builder's remedy. A trial court "cannot order more Mount Laurel housing even if the municipality could have provided more." Tanenbaum, 407 N.J. Super. at 457 (citing generally Livingston Builders, 309 N.J. Super. 370).

Here, the property was zoned as low density residential at the time Bergman entered into the option contract. At no time did Bergman file any application for rezoning of the property. In May 2017, the Township informed Bergman that the property would be considered for additional affordable housing, along with other properties. And, the proposals were "entirely inconsistent with the Township's current zoning" regularities. During the second fairness hearing, the Township's representative testified "[t]here was always interest in [the] property for the purpose . . . . [of] affordable housing. . . . [but] [i]t was rejected . . . because the [Township] was concerned with its proximity in a blast zone to a compressor station."

Clearly, the Township had not "manipulated out of existence an actual building opportunity," but rather rejected the property for legitimate reasons in favor of alternative locations. Indeed, the Township achieved its fair-share obligation without including the property and was entitled to restrict the use of the property as it deemed reasonable. See Mount Olive II, 356 N.J. Super. at 507; Mount Olive I, 340 N.J. Super. at 538.

24

D.

Next, Bergman contends the amended settlement agreement "truncates and reduces by a large margin," approximately thirty percent, "the number of affordable units ever to be constructed . . . . through the use of stratagems such as rental bonus credits and deed restricting homes." Bergman summarizes various "stratagems" that he contends the Township unconstitutionally employed to reduce its margin,[10] but he does not argue the use of the stratagems in and of themselves to be unconstitutional. Rather, Bergman argues that trial courts are required to provide a "realistic opportunity" analysis prior to accepting bonus credits or other reduction stratagems.

According to Bergman, a "realistic opportunity" analysis requires a trial court to weigh the facts of the case, and determine whether: (1) "the economic rationale that motivated COAH . . . to allow the use of . . . bonus credits still prevailed at the time of hearing;" and (2) "the loss of . . . units due to rental and other credits undermined the fundamental fairness of the settlement," relying on the Court's holding in Mount Laurel IV. "As the Supreme Court has made clear, the trial court, acting in COAH's place, may apply COAH's former rules 'if persuaded that the techniques proposed . . . will promote . . . [the

---

[10] Bergman's summary of stratagems includes the usage of: (1) rental bonus credits; (2) surplus units credits; (3) senior special needs credits; (4) group home bedroom credits; and (6) market-to-affordable deed restrictions.

25

municipality's] fair share of . . . low- and moderate-income housing.'" (Emphasis added) (first, third, and fourth alterations in original) (emphasis added) (quoting Mount Laurel IV, 221 N.J. at 30).

First, although not advanced by Bergman, the use of bonus credits and reduction stratagems are constitutional under common law. These stratagems were originally adopted and codified within COAH's First and Second Round methodologies, N.J.A.C. 5:92-1.1 to -19, and N.J.A.C. 5:93-1 to -13.4 respectfully. See In re N.J.A.C. 5:94 & 5:95, 390 N.J. Super. at 23-25; Toll Bros., 334 N.J. Super. at 104. The Court has noted various legal challenges to COAH's Second Round methodology, including reductions for bonus credits, have failed. See In re Adoption of N.J.A.C. 5:96 (In re N.J.A.C. 5:96), 215 N.J. 578, 592 (2013); see also In re N.J.A.C. 5:94 & 5:95, 390 N.J. Super. at 25 (noting examples of failed legal challenges to COAH's First and Second Round rules, including bonus credits).

Most recently, in 2007, multiple appellants contested "the validity of these credits and bonus credits" claiming "the award of bonuses and credits unconstitutionally dilutes the affordable housing required to meet the identified statewide need." In re N.J.A.C. 5:94 & 5:95, 390 N.J. Super. at 81. Appellants requested this court "to hold that: (1) no unit can receive a credit unless the unit actually exists; and (2) no unit can be credited unless it is likely

to be occupied by a person included in the calculation of need." See id. at 83. In response, however, we once again upheld the constitutionality of the stratagems. Ibid. We also noted it was "reasonable for COAH to provide incentives for housing for the very poor" and that appellants had offered "no persuasive reasons for departing from existing precedent." Ibid.

In 2015, our Court "declared COAH defunct and eliminated the FHA's exhaustion-of-administrative-remedies requirement." In re Declaratory Judgment Actions, 227 N.J. at 515 (citing Mount Laurel IV, 221 N.J. at 5-6). In response, the Court "provided for a judicial forum to adjudicate affordable housing disputes once more" and "instructed the courts to follow certain guidelines 'gleaned from the past.'" Ibid. (quoting Mount Laurel IV, 221 N.J. at 29-30). Such guidelines specifically included that "Mount Laurel judges may exercise the same level of discretion [as COAH] when evaluating a municipality's plan for Mount Laurel compliance," including "the allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations." Mount Laurel IV, 221 N.J. at 31-32. On October 16, 2016, COAH's Second Round rules expired, including its reduction stratagems. See generally N.J.A.C. 5:93-1 to -13.4.

The record here is replete with references to the expired Second Round rules. The trial court also noted the current ongoing confusion as to the now expired COAH methodologies:

> [H]ere let me just talk briefly about COAH and there's been a lot of back and forth and the [c]ourt sort of indicated, you know, sometimes where it's convenient to talk about the COAH regulations are coming in, and other times it's no, COAH is defunct, and does COAH have any meaning in today's world post Mount Laurel IV, and the [c]ourt would simply indicate that the spirit of those COAH regulations are something that the [c]ourt can consider in an overall analysis of whether or not the plan is fair, and that is clearly articulated in Mount Laurel.

The trial court held "bonus credits have been permissible from the inception of Mount Laurel through COAH. The [c]ourt sees no reason to reject it now. It's common, it's acceptable, it's ubiquitous and it's appropriate." The parties cite the Second Round rules and seemingly rely on an understanding that in Mount Laurel IV, the Court created common law[11] "Third Round" methodologies, which include and incorporate the Second Round reduction stratagems. See In re Declaratory Judgment Actions, 227 N.J. at 515 ("[W]e provided for a judicial forum to adjudicate affordable housing disputes once more. . . . [and] directed [the] [courts] [to] ascertain affordable housing need using the

---

[11]   Defining "common law" as "[t]he body of law derived from judicial decisions, rather than from statutes or constitutions." Black's Law Dictionary (11th ed. 2019).

methodologies set forth in COAH's First and Second Round rules."). Undeniably, the use of bonus credits and reduction stratagems are constitutional pursuant to the Court's holding in Mount Laurel IV.

Second, in Mount Laurel IV, the Court specifically identified and instructed trial courts to approve "the allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations." 221 N.J. at 31-33. Furthermore, the Court specifically "provided a process by which a town might obtain the equivalent of substantive certification for its fair share housing plan and avoid exclusionary zoning actions, after a court assessed the town's fair share responsibility." In re Declaratory Judgment Actions, 227 N.J. at 523 (emphasis added) (citing Mount Laurel IV, 221 N.J. at 5-6, 9-20). In addition, the Court "gave the trial courts considerable flexibility in assessing need, allocating it by region and municipality, and in evaluating municipal plans for compliance, [but] did identify some parameters for the courts' actions." Id. at 525 (citing Mount Laurel IV, at 29–33). Beyond those parameters, the Court specifically "did not limit the work of the trial courts except to attempt to cabin the time within which progress would be made toward recapturing the lost opportunity to advance municipal compliance with affordable housing obligations." Ibid. (citing Mount Laurel IV, 221 N.J. at 33).

29

Bergman's "realistic opportunity" analysis directly contradicts the Court's required process and parameters, and it ignores the Court's approval of "allowance of bonus credits towards satisfaction of a municipality's affordable housing obligations." Mount Laurel IV, 221 N.J. at 31. The Court even approved the usage of additional bonuses not included in either the First or Second Round rules. Id. at 31-32 (approving bonus credits for usage of new construction, for units affordable to members of the "public earning thirty percent or less of the median income," and "Smart Growth" and "Redevelopment" bonuses).

Therefore, pursuant to Mount Laurel IV, the trial court here was not required to provide an analysis of whether "the economic rationale that motivated COAH . . . to allow the use of . . . bonus credits still prevailed at the time of hearing." Thus, the trial court was free to accept all bonus credits and reduction stratagems so long as the municipality's fair share plan, as a whole, was fair and reasonable. E./W. Venture, 286 N.J. Super. at 328.

Third, the purpose of the Court's Mount Laurel IV decision was to expedite municipalities' voluntary compliance with their Mount Laurel obligations. "Rules to govern the [T]hird [R]ound cannot wait further while time is lost . . . . A remedy must be put in place to eliminate the limbo in which municipalities, New Jersey citizens, developers, and affordable housing

interest groups have lived for too long."  Mount Laurel IV, 221 N.J. at 9

(quoting In re N.J.A.C. 5:96 & 5:97, 215 N.J. at 620).  The Court elaborated:

> [C]ourts should endeavor to secure, whenever possible, prompt voluntary compliance from municipalities in view of the lengthy delay in achieving satisfaction of towns' Third Round obligations.  If that goal cannot be accomplished, with good faith effort and reasonable speed, and the town is determined to be constitutionally noncompliant, then the court may authorize exclusionary zoning actions seeking a builder's remedy to proceed against the towns . . . .
>
> [Id. at 33–34.]

The purpose of the Court's Mount Laurel IV decision is consistent with the Court's long endorsed "policy of encouraging the settlement of litigation." Boonton Twp., 197 N.J. Super. at 366; see also Mount Laurel II, 92 N.J. at 352 ("[T]he Mount Laurel obligation is to provide a realistic opportunity for housing, not litigation.").

We conclude Bergman's proposed "realistic opportunity" analysis directly contradicts the Court's avowed goal in Mount Laurel IV.  First, requiring every trial court to consider whether "the economic rationale that motivated COAH . . . to allow the use of . . . bonus credits still prevailed at the time of hearing" for each and every individual municipality, would substantially delay every municipality's compliance with its individual Mount Laurel obligation.  Second, an analysis of that scale would require an in-depth

31

review of important social, economic, and constitutional matters, which may affect every municipality.

The Court has repeatedly recognized that a legislative or administrative remedy would better handle such considerations. In re Declaratory Judgment Actions, 227 N.J. at 531; Mount Laurel IV, 221 N.J. at 34 ("It is our hope that an administrative remedy will again become an option for those proactive municipalities that wish to use such means to obtain a determination of their housing obligations and the manner in which those obligations can be satisfied."). Third, Berman's proposed analysis would interfere with a municipality's voluntary compliance with their Mount Laurel obligations.

Bonus credits and reduction stratagems are "part of a comprehensive scheme to encourage municipalities and developers to build affordable . . . units in the future." In re N.J.A.C. 5:94 & 5:95, 390 N.J. at 82 (quoting Calton Homes, Inc. v. Council on Affordable Hous., 244 N.J. Super. 438, 457 (App. Div. 1990)). And, such stratagems "are an appropriate tool to create incentives for types of housing that may not otherwise be provided in the municipality." Id. at 83 (internal quotation marks omitted). As a result, a trial court may not interfere with a municipality's fair share plan based on the allocation of bonus credits and reduction stratagems, so long as it is, as a whole, fair and reasonable. E./W. Venture, 286 N.J. Super. at 328.

32

III.

Finally, Bergman argues Lonergan had a conflict of interest because she, and her firm, actively represent municipalities as both special masters and as advisors. Bergman argues "Lonergan and her firm are caught in a revolving door: [first] advising large numbers of courts . . . as to the validity of municipal affordable housing proposals[;] and then . . . representing dozens of municipalities . . . using the very same methodologies and advocating that [such methodologies] . . . satisfy [Mount] Laurel doctrine." In response, the Township claims Lonergan had neither "a financial interest in the matter" nor was "directly linked" to any party who had such an interest.

A special master's role is purely advisory. Deland v. Twp. of Berkeley, 361 N.J. Super. 1, 12 (App. Div. 2003). Special masters may be appointed by a trial court to render opinions, propose findings, issue recommendations, and assist "the court in other similar ways as [the court] may direct." Id. at 8; see also Mount Laurel II, 92 N.J. at 281-85 (authorizing trial courts assigned to hear Mount Laurel cases to appoint special masters). A "special master is only authorized to make recommendations," however, "and may not be delegated decision-making authority." Deland, 361 N.J. Super. at 8 (citing Mount Laurel II, 92 N.J. at 284-85). Instead, "[i]t is the trial court that must ultimately determine, independently, whether or not the municipality has conformed to its

33

judgment and to the <u>Mount Laurel</u> doctrine." <u>Id.</u> at 12 (quoting <u>Mount Laurel II</u>, 92 N.J. at 284-85).

A special master is subject to "substantially the same conflict of interest rules as judges." <u>Ibid.</u> Under <u>Rule</u> 1:12-1(g), a special master has a conflict of interest if "there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." <u>Rule</u> 1:12-1(g) does not require actual prejudice. <u>DeNike v. Cupo</u>, 196 N.J. 502, 517 (2008) (quoting <u>State v. Marshall</u>, 148 N.J. 89, 279 (1997)).

Under <u>Rule</u> 1:12-1(g), a special master has a conflict of interest if a party could have an objectively reasonable belief that the proceedings were tainted by an appearance of impropriety or if an objective observer might reasonably wonder whether the special master favored a party either consciously or unconsciously. <u>Ibid.</u> A special master's conflict of interest, however, does not inherently require remand. <u>See</u> <u>Deland</u>, 361 N.J. Super. at 13 (holding rulings that are primarily legal in nature can fairly be reviewed regardless of the special master's conflict of interest); <u>see also</u> <u>Mount Laurel II</u>, 92 N.J. at 288 n.42 (noting the court need not "accept the master's suggestions or recommendations. The master may well have substantial influence on the outcome but only because his [or her] expertise is persuasive . . .").

In Deland, we determined the special master assigned to the respective Mount Laurel case had a conflict of interest due to his financial interests in the matter. 361 N.J. Super. at 12-13. The special master assigned in that case: (1) was actively employed as a "planner for the developer-plaintiffs in other Mount Laurel cases"; and (2) held financial interests in both the developer-plaintiffs and "a developer who stands to benefit from the planner's recommendations as a special master." Ibid. Although we held the special master's professional and financial entanglements with the developer-plaintiffs constituted a conflict, we did not conclude the special master's alternative employment as a planner, sans financial relationship to the developer-plaintiffs, to have been a conflict.

"[W]e recognize[d] that most Mount Laurel special masters are planners who serve in this role on a part-time basis and also provide advice to developers and municipalities involved in other Mount Laurel litigation." Id. at 12. Moreover, although the current system of appointment of special masters for Mount Laurel cases "creates the inherent potential for conflict," our holding was limited to conflict of interests caused by a special master's financial interests. See id. at 12-13 (holding once the special master became aware of his financial interests in the matter, the special master "should have refrained from providing any recommendation to the court").

35

Bergman does not claim Lonergan had a direct financial interest in either the Township or the benefits emanating from the amended settlement agreement. Rather, Bergman "presents the question of whether a special master is conflicted where [Lonergan] and her firm are simultaneously representing dozens of municipalities in crafting affordable housing plans containing the same methodologies on which she is advising the trial court as a 'neutral' advisor."

In <u>Deland</u>, we recognized that an assignment as a <u>Mount Laurel</u> special master is generally part-time employment. <u>Id.</u> at 12. And, most <u>Mount Laurel</u> special masters also serve as planners, providing "advice to developers and municipalities involved in other <u>Mount Laurel</u> litigation[s]." <u>Ibid.</u> Thus, a special master may "simultaneously represent[] dozens of municipalities in crafting affordable housing plans containing the same methodologies on which [he or] she is advising the trial court," unless the special master has a financial interest in the case, either via his or her employment as a planner or interests in the benefits of the case, <u>see</u> <u>id.</u> at 12-13. Based upon our careful review of the record, Lonergan did not have a financial conflict of interest in this matter and Bergman's argument is devoid of merit.

The COAH rules, which <u>Mount Laurel IV</u> requires trial courts use, support the order under review. <u>See</u> 221 N.J. at 29-34. We conclude the

36

record contains sufficient credible evidence to support the trial court's finding the amended agreement sets forth a plan that provides a realistic opportunity for the Township to meet its Third Round obligation under Mount Laurel. The court correctly found that the Township established a prima facie case of compliance, and the burden then shifted to Bergman to establish it failed to do so. The court's finding Bergman failed to sustain that burden is supported by sufficient credible evidence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION